**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

HMC INCORPORATED and
KARA DIPIETRO,

               Plaintiffs,

               v.

COMPLETE BUSINESS SOLUTIONS
GROUP, INC. d/b/a PAR FUNDING and
FAST ADVANCE FUNDING, INC.,

               Defendants.

Civil Action No. 19-cv-03285-JS

---

**DEFENDANTS COMPLETE BUSINESS SOLUTIONS GROUP, INC. AND FAST
ADVANCE FUNDING, INC.'S STATEMENT OF MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to this Court's Policies and Procedures, Defendants Complete Business Solutions

Group, Inc. d/b/a Par Funding ("CBSG") and Fast Advance Funding, Inc. ("FAF") (together,

"Defendants"), by and through their undersigned counsel, hereby submit this Statement of Material

Facts in support of their Motion for Summary Judgment:

**Plaintiffs' Claims and Defenses, and Defendants' Counterclaims**

1.      Plaintiffs purport to state causes of action against Defendants for violations of the

United States mail and wire fraud statute, common law fraud, civil RICO, RICO conspiracy, and

breach of contract. *See* Ex. 15, Pls.' First Amended Complaint, ECF No. 10, at Counts I-IV.

2.      Defendants state counterclaims against Plaintiffs in this action—specifically, FAF

states breach of contract claims against Plaintiffs HMC Incorporated ("HMC") and Kara DiPietro

("DiPietro"), and CBSG states a breach of contract claim against DiPietro. *See* Ex. 16 (APPX.

0040-0072)[1], Defs' First Am. Answer with Affirmative Defenses and Counterclaims, ECF No. 15; *see also* Ex. 17 (APPX. 0073-0099), CBSG's Am. Answer with Affirmative Defenses, ECF No. 19.

3.      Plaintiffs purport to state the following affirmative defenses to Defendants' counterclaims: unconscionability, duress, and extortion. *See* Ex. 18 (APPX. 0105-0108), Pls.' Answer to Defs.' Counterclaims, ECF No. 18, at Affirmative Defenses.

**<u>Plaintiffs' Commercial Sophistication</u>**

4.      HMC, which has been in existence for over 30 years, is a full-service design/build and custom millwork firm, historically providing services across the country and specializing in food service and dining facilities, until more recently, when the business has "very much changed" and the company has "made lots of changes as it related to how the market was working." *See* Ex. 1, July 6, 2020 Deposition of Kara DiPietro ("DiPietro Dep. (7/6/20)"), at 34:1-36:2; Ex. 4, July 9, 2020 Deposition of Joshua Persing ("Persing Dep. (7/9/20)" or "Persing 2nd Dep."), at 156:7-15; Ex. 5, March 12, 2020 Deposition of Gerry Dzurek ("Dzurek Dep."), at 30:6-20, 31:9-14, 71:4-11, 32:3-11, 43:13-45:2, 61:13-62:2.

5.      HMC has performed jobs for hotels, schools, hospitals, and military bases across the country, and been registered to do business in multiple states. *See* Ex. 1, DiPietro Dep. (7/6/20), at 32:12-20, 34:3-5, 125:14-15; Ex. 3, March 12, 2020 Deposition of Josh Persing ("Persing Dep. (3/12/20)" or "Persing 1st Dep."), at 61:16-62:18, 84:4-85:2; *see also* Ex. 101 (APPX. 1917-1935), HMC Executive Summary Report (Persing 2nd Dep. Ex. 29), produced at HMC074986-

---

[1]      All Exhibits cited herein, with the exception of deposition transcripts, have been separately stamped in Defendants' Appendix with the pagination prefix of "APPX." The deposition transcripts are still included in Defendants' Appendix.

HMC075003, at HMC074989; Ex. 69 (APPX. 1552-1572), HMC's Collection of Gratitude Book to CBSG (DiPietro Ex. 42), produced at CBSG(HMC)0021851-CBSG(HMC)0021870.

6.      HMC was founded by Gerry Dzurek ("Dzurek") in 1989 and then sold to his daughter, DiPietro, in 2015, and she has been the 100% owner since the sale. *See* Ex. 1, DiPietro Dep. (7/6/20), at 36:16-21, 51:4-9, 68:4-6; Ex. 5, Dzurek Dep., at 10:6-11, 20:14-21:2, 31:9-14, 85:5-8.

7.      DiPietro, a sophisticated business owner of three different companies, was chosen as Maryland's small business person of the year in 2017 and is a member of U.S. Women's Chamber of Commerce. *See* Ex. 1, DiPietro Dep. (7/6/20), at 40:2-6, 94:9-17, 158:20-22; *see also* Ex. 70 (APPX. 1573-1575), 2017 MD Small Business Person of the Year Award Article; Ex. 71 (APPX. 1576-1579), U.S. Women's Chamber of Commerce Biography for DiPietro.

8.      As CEO and owner of HMC, she is responsible for running all aspects of the business and overseeing operations, business development, budge, company financials, and company strategic decisions. *See* Ex. 1, DiPietro Dep. (7/6/20), at 97:1-19, 17:12-15; *see also* Ex. 3, Persing Dep. (3/12/20), at 86:21-87:7.

9.      Since 2013, HMC has had millions of dollars in revenue and DiPietro's email signature identifies HMC as one of the 5,000 fastest growing companies in the U.S. *See* Ex. 1, DiPietro Dep. (7/6/20), at 32:6-11, 33:10-34:2, 68:14-16, 158:23-159:3; Ex. 4, Persing Dep. (7/9/20), at 62:2-22; Ex. 5, Dzurek Dep., at 73:6-10; *see also* Ex. 101 (APPX. 1917-1935), HMC Executive Summary Report (Persing 2nd Dep. Ex. 29), produced at HMC074986-HMC075003, at HMC074996 (showing revenue totals from 2013 through 2019).

10.     HMC has had more than $7 million in revenue since June 1, 2019. *See* Ex. 1, DiPietro Dep. (7/6/20), at 212:16-20; Ex. 2, July 7, 2020 Deposition of Kara DiPietro ("DiPietro Dep. (7/7/20)"), at 36:21-37:2, 43:5-8.

11.     In that same time period HMC has generated more than $2 million in income. *See* Ex. 2, DiPietro Dep. (7/7/20), at 37:8-9, 43:5-8.

12.     Since 2015, HMC has had approximately 25-35 employees. *See* Ex. 1, DiPietro Dep. (7/6/20), at 68:8-13, 93:15-22; Ex. 3, Persing Dep. (3/12/20), at 48:6-10; *see also* Ex. 72 (APPX 1580-1581), HMC 2019 Management Chart (Persing 2nd Dep. Ex. 28), produced at CBSG(HMC)0017640.

13.     HMC hires lawyers and accountants. *See* Ex. 1, DiPietro Dep. (7/6/20), at 38:2-4, 196:10-22, 293:2-5; Ex. 3, Persing Dep. (3/12/20), at 54:13-55:15, 56:3-57:11; *see also* Ex. 62 (APPX. 1114-1125), Sandy Spring Bank Records Excerpts (showing over $70,000 in payments to White & Williams).

**Plaintiffs' Notice, Awareness, and Acceptance of the MCA Industry**

14.     Plaintiffs, who were unable to secure bank financing, received merchant cash advance (MCA) money before CBSG, and signed "a lot" of MCA agreements. *See* Ex. 1, DiPietro Dep. (7/6/20), at 138:21-139:7, 139:16-24, 140:12-15, 159:24-160:20, 183:21-23, 193:11-15; Ex. 22 (APPX. 0155-0158), Pls.' Interrogatory Answers, No. 4; *see also* Exs. 102-106 (APPX. 1936-2014), Other MCA Agreements.

15.     Plaintiffs were "very familiar" with daily payments and paybacks in MCA agreements. *See* Ex. 1, DiPietro Dep. (7/6/20), at 140:12-20.

16. Plaintiffs have sought but not signed for any MCA money after Defendants' deals. *See* Ex. 1, DiPietro Dep. (7/6/20), at 172:23-174:6; *see also* Ex. 73 (APPX. 1582-1592), Email from K. DiPietro to E. Greissman (2/3/20), produced at HMC045804.

17. HMC, LLC—a company owned by Dzurek with the same address as HMC, Inc. and which DiPietro has called HMC's "west coast affiliate" and clams to contribute 7% of "company revenue"—has actually received MCA money after the parties' factoring agreements, and transferred it to HMC, Inc. *See* Ex. 1, DiPietro Dep. (7/6/20), at 41:16-20; Ex. 4, Persing Dep. (7/9/20), at 159:17-22; Ex. 5, Dzurek Dep., at 172:14-173:5, 183:16-19; *see also* Ex. 59 (APPX. 1057-1076), Reliant Funding MCA Agreement; Ex. 73 (APPX. 1582-1592), Email from K. DiPietro to E. Greissman (2/3/20), produced at HMC045804.

18. DiPietro formed Kinetic Capital, LLC ("Kinetic Capital") in 2018, an ISO for CBSG, and began to connect or "steer" businesses looking for cash advances, including her father's consulting group (The Dzurek Group), with CBSG for funding. *See* Ex. 1, DiPietro Dep. (7/6/20), at 97:20-98:14, 162:10-163:2, 169:14-170:7, 197:7-8, 292:12-16, 295:15-21, 296:10-14, 375:13-23, 377:4-6; Ex. 3, Persing Dep. (3/12/20), at 37:2-20, 391:21-392:7, 396:2-14; Ex. 4, Persing Dep. (7/9/20), at 119:17-22; *see also*, *e.g.*, Ex. 74 (APPX. 1593-1595), Email from K. DiPietro to T. Villarose, *et al.* (12/14/18), produced at CBSG(HMC)0017245-CBSG(HMC)0017246.

19. DiPietro used CBSG's agreement in forming Kinetic Capital's standard form contract. *See* Ex. 75 (APPX. 1596-1623), Email from K. DiPietro to J. Mack, *et al.* (4/19/19) (Persing 1st Dep. Ex. 15), with attachment; *compare with*, *e.g.*, Ex. 30 (APPX. 0420-0440), Factoring Agreement (2/15/18); *see also* Ex. 1, DiPietro Dep. (7/6/20), at 299:21-23; Ex. 3, Persing Dep. (3/12/20), at 38:15-39:7, 300:1-20; Exs. 30-58 (APPX. 0420-1056), Factoring Agreements.

20.     DiPietro consulted with an attorney in preparing Kinetic Capital's standard form contract. *See* Ex. 76 (APPX. 1624-1627), Email from K. DiPietro to J. Cole, *et al.* (10/22/18), produced at CBSG(HMC)0014387 (DiPietro Dep. Ex. 27); *see also* Ex. 1, DiPietro Dep. (7/6/20), at 199:10-18, 292:23-293:5, 294:10-17; Ex. 3, Persing Dep. (3/12/20), at 398:6-9.

**<u>Plaintiffs' Factoring Agreements with Defendants</u>**

21.     HMC was connected to CBSG through a broker, at a time when HMC had other MCA agreements in effect. *See* Ex. 1, DiPietro Dep. (7/6/20), at 247:7-22, 249:3-7.

22.     Plaintiffs' first factoring agreement with CBSG on February 15, 2018. *See* Ex. 30 (APPX. 0420-0440), Factoring Agreement (2/15/18); *see also* Ex. 1, DiPietro Dep. (7/6/20), at 143:23-144:2, 176:5-8, 202:16-18, 248:22-249:1; Ex. 25 (APPX. 0173-0174), July 23, 2020 Declaration of Joe Cole ("Cole Dec."), at ¶¶ 3-5; Ex. 100 (APPX. 1778-1916)[2], Accounting Summary of Defendants' Transactions with HMC, produced at CBSG(HMC)0024482.

23.     Plaintiffs admit "[w]e did a lot of deals" with CBSG and, in fact, signed more than 50 factoring agreements with CBSG. *See* Exs. 30-53, 55-57 (APPX. 0420-0933; 0956-1030), CBSG Factoring Agreements; *see also* Ex. 22 (APPX. 0155-0158), Pls.' Interrogatory Answers, No. 4; Ex. 1, DiPietro Dep. (7/6/20), at 202:24-203:6, 232:13-14, 299:24-300:2; Ex. 25 (APPX. 0173-0174), Cole Dec., at ¶¶ 3-5; Ex. 100 (APPX. 1778-1916), Accounting Summary of Defendants' Transactions with HMC, produced at CBSG(HMC)0024482.

24.     The last two factoring agreements with CBSG were signed on December 19, 2018 and February 27, 2019, and were funded in weekly installments, with the daily payment amounts beginning at a certain amount and increasing based on additional income. *See* Ex. 56 (APPX.

---

[2]     This Exhibit is the subject of Defendants' contemporaneously-filed Motion to File Document Under Seal.

0985), Factoring Agreement (12/19/18), at p. 2 ("Daily Specified Amount to be determined on percentage of income."); Ex. 57 (APPX. 1009), Factoring Agreement (2/27/19), at p. 2 ("Daily Specified Amount begins at $4,583.00 per day, and increases based on percentage of income.").

25.    CBSG advanced HMC approximately $3.89 million over several weeks under the December 19, 2018 agreement, and approximately $3.35 million over several weeks under the February 27, 2019 agreement. *See* Ex. 1, DiPietro Dep. (7/6/20), at 152:5-19, 154:13-20, 243:13-244:22, 332:20-333:6, 360:5-14, 361:6-8; *see also* Ex. 3, Persing Dep. (3/12/20), at 339:15-340:7, 340:13-21, 341:13-20; Ex. 78 (APPX. 1631-1636), Collection of HMC Requests for Weekly Funding (Persing 1st Dep. Ex. 10); Ex. 22 (APPX. 0211), July 9, 2020 Expert Report of J. Duross O'Bryan ("O'Bryan Report"), at Attachment 8 (p. 1); Exs. 63-65, 67 (APPX. 1126-1384; 1391-1459), Plaintiffs' Bank Statements.

26.    Plaintiffs signed two factoring agreements with FAF. *See* Exs. 54, 58 (APPX. 0934-0955; 1031-1056), FAF Factoring Agreements.

27.    The factoring agreements were read and signed by DiPietro on behalf of HMC, in her capacity as owner and principal for HMC, and she testified that "I understand every deal that we have." *See*, *e.g.*, Ex. 30 (APPX. 0422-0424), Factoring Agreement (2/15/18), at pp. 2-3 and § 2.3; *see also* Exs. 31-58 (APPX. 0441-1056), Factoring Agreements (same provisions); Ex. 2, DiPietro Dep. (7/7/20), at 32:19, 186:17-187:2.

28.    DiPietro also personally guaranteed HMC's performance of and obligations under the factoring agreements. *See*, *e.g.*, Ex. 30 (APPX. 0429), Factoring Agreement (2/15/18), at Guaranty, p. 9; *see also* Exs. 31-58 (APPX. 0441-1056), Factoring Agreements (same guaranties).

29.    The factoring agreements were entered into for a business purposes. *See*, *e.g.*, Ex. 30 (APPX. 0424; 0430), Factoring Agreement (2/15/18), at § 2.12 ("Merchant is entering into this

Agreement FOR BUSINESS PURPOSES ONLY and not as a consumer for personal, family or household purposes."), p. 8 (Disclosure for Confession of Judgment), and p. 10 (Authorization Agreement for Direct Deposit and Authorization to Resume ACH Debiting Form) (attesting that the bank accounts are established for a business purpose); *see also* Exs. 31-58 (APPX. 0441-1056), Factoring Agreements (same provisions); Ex. 2, DiPietro Dep. (7/7/20), at 176:15-177:15.

30.     The parties' factoring agreements are governed by Pennsylvania law. *See*, *e.g.*, Ex. 56 (APPX. 0986; 0988), Factoring Agreement (12/19/18), at §§ 1.10, 4.6; *see also* Exs. 30-55; 57-58 (APPX. 0420-0981; 1006-1056), Factoring Agreements (same provisions).

31.     Under the parties' factoring agreements, HMC was advanced a total of $25,432,102.20. *See* Ex. 25 (APPX. 0173-0174), Cole Dec., at ¶¶ 3-5; *see also* Ex. 100 (APPX. 1778-1916), Accounting Summary of Defendants' Transactions with HMC, produced at CBSG(HMC)0024482; Exs. 30-58 (APPX. 0420-1056), Factoring Agreements.

32.     Under the parties' factoring agreements, Plaintiffs agreed to pay a total of $36,549,626.08 in future receivables. *See* Ex. 25 (APPX. 0173-0174), Cole Dec., at ¶¶ 3-5; *see also* Ex. 100 (APPX. 1778-1916), Accounting Summary of Defendants' Transactions with HMC, produced at CBSG(HMC)0024482; Exs. 30-58 (APPX. 0420-1056), Factoring Agreements.

33.     Under the parties' factoring agreements, the future receivables purchased by either CBSG or FAF, as the case may be, from HMC are paid to the purchaser (CBSG or FAF) in daily payments. *See*, *e.g.*, Ex. 56 (APPX. 0985-0987; 0994; 0996), Factoring Agreement (12/19/18), at p. 2, §§ 1.1, 1.2, 1.11, 1.13 (Protection 7), p. 11 (Authorization Agreement for Direct Deposit), p. 13 (Authorization to Resume ACH Debiting Form); *see also* Exs. 30-55; 57-58 (APPX. 0420-0981; 1006-1056), Factoring Agreements (same provisions).

34.     Under the parties' factoring agreements, HMC waived rights to recover consequential or punitive damages. *See*, *e.g.*, Ex. 56 (APPX. 0986), Factoring Agreement (12/19/18), at § 1.8; *see also* Exs. 30-55; 57-58 (APPX. 0420-0981; 1006-1056), Factoring Agreements (same provisions).

35.     Plaintiffs voluntarily entered into all agreements, were not forced into signing them, and described HMC's relationship with CBSG in 2018 as "great." *See* Ex. 1, DiPietro Dep. (7/6/20), at 194:20-195:21, 250:22-251:2, 252:15-18; Ex. 2, DiPietro Dep. (7/7/20), at 187:8-9.

36.     Plaintiffs negotiated the terms of their MCA agreements and knowingly "structured the draws and the daily payment" in the parties' factoring agreements. *See* Ex. 1, DiPietro Dep. (7/6/20), at 194:20-195:21; Ex. 2, DiPietro Dep. (7/7/20), at 48:3-6; *see also* Ex. 6, June 30, 2020 Deposition of Joe Cole ("Cole Dep."), at 57:6-22, 254:21-255:1, 265:3-11; Ex. 7, June 29, 2020 Deposition of Wendy Lyday ("Lyday Dep."), at 54:3-15, 68:17-69:1, 99:15-22, 110:15-21.

37.     Before signing any MCA agreement, DiPietro "discussed things with lots of people," including other employees at HMC and accountants, and she had the opportunity to review with an attorney even if it was not actually reviewed by one. *See* Ex. 1, DiPietro Dep. (7/6/20), at 195:23-196:22, 201:1-10.

38.     On January 12, 2019, Plaintiffs expressed gratitude to CBSG for making HMC's business possible by providing "A Collection of Gratitude" book. *See* Ex. 69 (APPX. 1552-1572), HMC's Collection of Gratitude Book to CBSG (DiPietro Ex. 42), produced at CBSG(HMC)0021851-CBSG(HMC)0021870 ("The pages that follow are a collection of projects HMC completed in 2018. You and everyone at CBSG have played an integral role to [*sic*] in HMC's success."); *see also* Ex. 1, DiPietro Dep. (7/6/20), at 263:13-15.

**Plaintiffs' Notice, Awareness, and Acceptance of Fees**

39.     As a general matter, finance fees are negotiated, and Plaintiffs incurred a $472,356.60 finance fee in November 2018, and a $412,296.24 finance fee in December 2018. *See* Ex. 6, Cole Dep., at 182:14-184:2, 186:17-187:4; *see also* Ex. 25 (APPX. 0173-0174), Cole Dec., at ¶¶ 3-5; Ex. 100 (APPX. 1782, 1788), Accounting Summary of Defendants' Transactions with HMC, produced at CBSG(HMC)0024482.

40.     Plaintiffs would often take advantage of early payoff discounts on certain factoring agreements, but not always. *See*, *e.g.*, Ex. 79 (APPX. 1637-1639), Emails between K. DiPietro and A. Lau, *et al.* (12/3/18) ("It's not that I didn't want to pay it off. It was that with our project billing schedules and new work, ***I wasn't able to time it properly***.") (quoting DiPietro; emphasis added) (Persing 2nd Dep. Ex. 11), produced at HMC014864-HMC014865; *see also* Ex. 4, Persing Dep. (7/9/20), at 98:12-18, 100:5-101:13; Ex. 80 (APPX. 1640-1642, Collection of Discount Emails (Persing 1st Dep. Ex. 8).

41.     Plaintiffs were made aware of, provided notice of, and did not contemporaneously object in writing to the $472,356.60 finance fee on the August 28, 2018 factoring agreement. *See* Ex. 81 (APPX. 1643-1646), Emails between A. Lau and K. DiPietro (11/8/18) (DiPietro Dep. Ex. 102), produced at HMC014795-HMC014797; *see also* Ex. 9, June 29, 2020 Deposition of Aida Lau ("Lau Dep."), at 82:20-83:6.

42.     In that same November 8, 2018 email exchange referenced above, Plaintiffs were given notice of a reassessed factor rate on the October 3, 2018 factoring agreement that would occur on December 7, 2018. *See* Ex. 81 (APPX. 1643-1646), Emails between A. Lau and K. DiPietro (11/8/18) (DiPietro Dep. Ex. 102), produced at HMC014795-HMC014797; *see also* Ex. 9, Lau Dep., at 46:8-13.

43.     HMC signed at least 20 more deals with CBSG after this first finance fee was assessed. *See* Ex. 1, DiPietro Dep. (7/6/20), at 324:24-325:2, 326:20-23; *see also* Exs. 53-58 (APPX. 0910-1056), Factoring Agreements (signed on or after November 7, 2018); Ex. 22 (APPX. 0155-0158), Pls.' Interrogatory Answers, No. 4.

44.     On December 6, 2018, Plaintiffs were told that the deal was "due tomorrow, or else fee will be accrued," for which Plaintiffs acknowledged receipt and thanked CBSG "for reminder." Ex. 82 (APPX. 1647-1648), Emails between A. Lau and K. DiPietro, *et al.* (12/6/18), produced at HMC041461.

45.     On December 7, 2018, Plaintiffs were told that their balance on the October 3, 2018 factoring agreement "will go up after today, are you okay with that?" and DiPietro responded "It is what it is – but if you'd like to throw in $450k or so be my guest lol!" and further stated "It'll all 'come out in the wash'". Ex. 83 (APPX. 1649-1652), Emails between A. Lau and K. DiPietro (12/7/18) (DiPietro Dep. Ex. 35), produced at CBSG(HMC)0009143-CBSG(HMC)0009145.

46.     In that same December 7, 2018 email exchange referenced above, Plaintiffs were provided the specific fee amount of $412,296.24 that "will be accrued after today," and Plaintiffs did not contemporaneously object in writing. Ex. 83 (APPX. 1649-1652), Emails between A. Lau and K. DiPietro (12/7/18) (DiPietro Dep. Ex. 35), at CBSG(HMC)0009145; *see also* Ex. 1, DiPietro Dep. (7/6/20), at 329:4-14, 330:6-8; Ex. 4, Persing Dep. (7/9/20), at 103:18-104:3, 105:15-18; Ex. 9, Lau Dep., at 81:18-82:4.

**Plaintiffs' Notice, Awareness, and Acceptance of Increasing Daily ACH Debits On Factoring Agreements Dated December 19, 2018 and February 27, 2019**

47.     Many of the parties' factoring agreements had payment clauses in which payments would increase at certain intervals. *See*, *e.g.*, Ex. 53 (APPX. 0913), Factoring Agreement (12/5/18) (graduated structure of purchased receivables based upon number of days); Ex. 50 (APPX. 0842),

Factoring Agreement (10/3/18) (increase in purchased receivables after 44 days); *see also* Ex. 9, Lau Dep., at 37:5-24.

48.     The parties' December 19, 2018 factoring agreement, with a Purchase Price of $3,890,000.00 and a Receipts Purchased Amount of $5,446,000.00, states that the Daily Specified Amount is "to be determined on percentage of income" and further states on its face that HMC "will be funded in weekly installments." *See* Ex. 56 (APPX. 0985), Factoring Agreement (12/19/18), at p. 2.

49.     Pursuant to the December 19, 2018 factoring agreement, Plaintiffs sold ten groups of accounts receivable at different dates to CBSG; for the initial funding, CBSG provided $630,500 on December 19, 2018, representing $882,700 of purchased receivables, and the initial payment made by HMC was $3,500, and the ratio of the initial payment amount of $3,500 to the initial purchased receivables of $882,700 is 0.40%. *See* Ex. 28 (APPX. 0189), O'Bryan Report, at 8; *see also* Ex. 56 (APPX. 0985), Factoring Agreement (12/19/18), at p. 2; Ex. 63-65, 67 (APPX. 1126-1384; 1391-1459), Plaintiffs' Bank Statements.

50.     For each additional purchase of receivables under the December 19, 2018 factoring agreement, CBSG was entitled to additional payments, rather than the same initial daily payment of $3,500, resulting in an increase in daily amounts owed. *See* Ex. 28 (APPX. 0189), O'Bryan Report, at 8; *see also* Ex. 56 (APPX. 0985), Factoring Agreement (12/19/18), at p. 2; Ex. 6, Cole Dep., at 350:18-20, 350:23-351:1, 365:14-19, 458:20-459:4, 461:20-462:2.

51.     On January 23, 2019, Plaintiffs were informed that CBSG would be "increasing the daily draw on the most recent daily contract" and that "The payment will go from $3,500.00 to $12,337.00 (over 154 days) this will be applied for the wires sent so far." Ex. 88 (APPX. 1666-1669), Email from L. Marianni to K. DiPietro, *et al.* (1/23/19) (DiPietro Dep. Ex. 103).

52.     Later that same day, DiPietro wrote Aida Lau an email with the subject line of "**Increase OK**" and specifically stated in the email that "**your good to increase,**" which was then confirmed internally within the parties. Ex. 88 (APPX. 1666-1669), Email from K. DiPietro to A. Lau (1/23/19) (DiPietro Dep. Ex. 103), produced at HMC031423 (emphasis added); *see also* Ex. 85 (APPX. 1658-1660), Email from A. Lau to J. Mack, *et al.* (1/23/19) (DiPietro Dep. Ex. 45), produced at CBSG(HMC)0009058-CBSG(HMC)0009059; Ex. 86 (APPX. 1661-1662), Email from K. DiPietro to J. Persing (1/23/19) (DiPietro Dep. Ex. 73), produced at HMC036571; Ex. 1, DiPietro Dep. (7/6/20), at 343:3-8; Ex. 4, Persing Dep. (7/9/20), at 106:5-22.

53.     Subsequently, the daily payment amount on the December 19, 2018 factoring agreement increased with each new distribution, at the same percentage from the initial daily payment. *See* Exs. 63-65, 67 (APPX. 1126-1384; 1391-1459),  Plaintiffs' Bank Statements; *see also* Ex. 28 (APPX. 0189), O'Bryan Report, at 8; Ex. 8, July 17, 2020 Deposition of J. Duross O'Bryan ("O'Bryan Dep."), at 71:23-72:5, 73:3-22; Ex. 6, Cole Dep., at 347:21-348:13, 448:13-449:1.

54.     On February 14, 2019, in response to DiPietro's question regarding what CBSG had for HMC's daily payment amount, Plaintiffs were informed that CBSG would "be increasing payment by $2,188.00 for each funding" and that "Tomorrow the payment will be $14,525.00 coming out from your account." Ex. 87 (APPX. 1663-1665), Emails between A. Lau and K. DiPietro, *et al.* (2/14/19) (DiPietro Dep. Ex. 105), produced at HMC009298-HMC009299; *see also* Ex. 4, Persing Dep. (7/9/20), at 112:5-11, 113:11-17; Ex. 67 (APPX. 1391-1459), TD Bank Statements (Dec. 2018-May 2019) (Persing 2nd Dep. Ex. 10), produced at TD0000859-TD0000926.

55.     Plaintiffs "knew the money was leaving" HMC's bank account at increasing amounts in February 2019, and Plaintiffs still signed another factoring agreement with CBSG on February 27, 2019. *See* Ex. 1, DiPietro Dep. (7/6/20), at 358:19-23, 361:9-18; *see also* Ex. 57 (APPX. 1030), Factoring Agreement (2/27/19).

56.     Indeed, DiPietro testified that "I am aware of every single penny that comes in and out of my business." *See* Ex. 1, DiPietro Dep. (7/6/20), at 403:19-24.

57.     The parties' February 27, 2019 factoring agreement, with a Purchase Price of $3,350,000.00 and a Receipts Purchased Amount of $4,690,000.00, states that the Daily Specified Amount "begins at $4,583.00 per day, and increases based on percentage of income." *See* Ex. 57 (APPX. 1009), Factoring Agreement (2/27/19), at p. 2.

58.     Pursuant to the February 27, 2019 factoring agreement, Plaintiffs sold nine groups of accounts receivable at different dates to CBSG; for the initial funding, CBSG provided $544,500 on February 27, 2019, representing $762,300 of purchased receivables, and the initial payment made by HMC was $4,583, and the ratio of the initial payment amount of $4,583 to the initial purchased receivables of $762,300 is 0.60%. *See* Ex. 28 (APPX. 0189), O'Bryan Report, at 8; *see also* Ex. 57 (APPX. 1009), Factoring Agreement (2/27/19), at p. 2; Ex. 63-65, 67 (APPX. 1126-1384; 1391-1459), Plaintiffs' Bank Statements.

59.     For each additional purchase of receivables under the February 27, 2019 factoring agreement, CBSG was entitled to additional payments, rather than the same initial daily payment of $4,583, resulting in an increase in daily amounts owed. *See* Ex. 28 (APPX. 0189), O'Bryan Report, at 8; *see also* Ex. 57 (APPX. 1009), Factoring Agreement (2/27/19), at p. 2; Ex. 6, Cole Dep., at 462:15-18.

60.     The daily payment amount on the February 27, 2019 factoring agreement increased with each new distribution, at the same percentage from the initial daily payment. *See* Ex. 63-65, 67 (APPX. 1126-1384; 1391-1459), Plaintiffs' Bank Statements; *see also* Ex. 28 (APPX. 0190), O'Bryan Report, at 9; Ex. 8, O'Bryan Dep., at 71:23-72:5, 73:3-22; Ex. 67 (APPX. 1391-1459), TD Bank Statements (Dec. 2018-May 2019) (Persing 2nd Dep. Ex. 10), produced at TD0000859-TD0000926 (showing wires from CBSG to HMC, including close to $1.5 million in April 2019); Ex. 4, Persing Dep. (7/9/20), at 130:6-131:5; Ex. 9, Lau Dep., at 87:22-88:5.

61.     Plaintiffs were made aware of the increases and did not contemporaneously object to these increases. *See* Ex. 4, Persing Dep. (7/9/20), at 132:3-6, 140:3-11; *see also* Ex. 9, Lau Dep., at 79:5-7, 103:1-7.

62.     Plaintiffs were routinely sent their account balances on the outstanding factoring agreements throughout 2020, without any objection in writing to the amounts owed. *See*, *e.g.*, Ex. 88 (APPX. 1666-1669), Email from A. Lau to K. DiPietro, *et al.* (1/23/19) (DiPietro Dep. Ex. 104), produced at HMC010601 (showing balance over $5.35 million); *see also* Ex. 89 (APPX. 1670-1672), Email from A. Lau to J. Persing (4/16/19) (DiPietro Dep. Ex. 54), produced at CBSG(HMC)0020526-CBSG(HMC)0020527 (showing balance over $12.9 million); Ex. 1, DiPietro Dep. (7/6/20), at 402:18-22; Ex. 4, Persing Dep. (7/9/20), 107:16-108:16, 109:9-110:1; Ex. 78 (APPX. 1631-1636), Collection of Account Balance Emails (Persing 1st Dep. Ex. 10).

63.     On February 25, 2019, Plaintiffs' internal correspondence shows that Plaintiffs acknowledged an open balance with CBSG over $10.5 million with a daily payment total of $63,036.68. *See* Ex. 90 (APPX. 1673-1676), Emails between J. Persing and K. DiPietro, *et al.* (2/25/19) (DiPietro Dep. Ex. 50), produced at HMC011613-HMC011615 (showing 10 agreements with open balances).

64.     On April 16, 2019, Plaintiffs' internal correspondence shows that HMC's daily payment "is up to $77,255.87, with the two largest stemming from the two larger deals which they've steadily increased payment for as we drew from the remaining balance," and also stated that "The first $3M deal [December 19, 2018 factoring agreement] is at $19,179.43 per day and the second [February 27, 2019 factoring agreement] is now up to $19,995.00 per day and will increase again with this week's draw another $5K per day based on recent trends," and further stated that HMC's balance "[b]ased upon my rough analysis" was "sitting at approximately $6,362,269 due to CBSG." Ex. 91 (APPX. 1677-1678), Emails between J. Persing and K. DiPietro (4/16/19) (Persing 2nd Dep. Ex. 26), produced at HMC010646; *see also* Ex. 4, Persing Dep. (7/9/20), at 128:14-129:1.

65.     On May 1, 2019, in correspondence regarding an attempt to obtain a "new funding contract" DiPietro told Mack that HMC's "balances are big" and that she allowed them to "run full course" so that CBSG made more money. *See* Ex. 92 (APPX. 1679-1681), Emails between K. DiPietro and J. Mack (5/1/19), produced at HMC015903-HMC015904.

66.     CBSG did not agree to provide more funding in May 2019. *See* Ex. 4, Persing Dep. (7/9/20), at 138:15-17.

67.     Plaintiffs did not dispute in writing any increases until CBSG stopped giving MCA money and, just weeks before May 2019, DiPietro wrote Mack informing him that "HMC is stronger than we have ever been. I know that it is 90% because of you and PAR Funding." *See* Ex. 93 (APPX. 1682-1684), Email from K. DiPietro to J. Mack (4/2/19) (DiPietro Dep. Ex. 53), produced at CBSG(HMC)0017922; *see also* Ex. 94 (APPX. 1685-1687), Emails between K. DiPietro and J. Mack (5/2/19), produced at CBSG(HMC)0009908-CBSG(HMC)0009909; Ex. 1,

16

DiPietro Dep. (7/6/20), at 262:22-263:12; Ex. 4, Persing Dep. (7/9/20), at 129:12-14, 137:8-20, 140:3-11; Ex. 6, Cole Dep., at 462:18-21.

68.     When Plaintiffs began to dispute the amounts in writing, Plaintiffs stated that "The *only* problem has been the ***rate of increase*** in the two daily payments without warning, not the total amount due." *See* Ex. 95 (APPX. 1688-1691), Emails between K. DiPietro and J. Mack, *et al.* (5/3/19) (Persing 2nd Dep. Ex. 38), produced at CBSG(HMC)0009366-CBSG(HMC)0009368 (emphasis in original).

### Plaintiffs' Default under Factoring Agreements, and the Consequences of Default

69.     Under the factoring agreements, it is a default not to pay receivables collected and to refuse to honor contractual obligations. *See, e.g.,* Ex. 56 (APPX. 0987), Factoring Agreement (12/19/18), at § 3.1; *see also* Exs. 30-55; 57-58 (APPX. 0420-0981; 1006-1056), Factoring Agreements (same provisions).

70.     In May 2019, Plaintiffs stopped paying Defendants entirely, and they have not paid Defendants since their bank accounts were levied that month. *See* Ex. 1, DiPietro Dep. (7/6/20), at 212:5-7, 213:17-19, 214:3-7; Ex. 2, DiPietro Dep. (7/7/20), at 37:16-17, 39:4-21; Ex. 3, Persing Dep. (3/12/20), at 371:13-372:7; Ex. 6, Cole Dep., at 137:17-20; *see also* Exs. 19-20 (APPX. 0111-0143), First and Second COJs.

71.     As of May 6, 2019, Plaintiffs had nine remaining active MCA agreements (eight with CBSG and one with FAF) where Defendants had purchased a total of $17.2 million of future accounts receivable from the Plaintiffs. *See* Ex. 28 (APPX. 0185; 0208; 0210) , O'Bryan Report, at 4 & Attachments 5 and 7; *see also* Exs. 19-20 (APPX. 0111-0143), First and Second COJs; Ex. 25 (APPX. 0173-0174), Cole Dec., at ¶¶ 3-5; Ex. 100 (APPX. 1778-1916), Accounting Summary

of Defendants' Transactions with HMC, produced at CBSG(HMC)0024482; Exs. 49-50, 53, 55-58 (APPX. 0817-0861; 0910-0933; 0956-1056), Factoring Agreements.

72.     The maximum remittance allowed amount under the remaining active MCA agreements is $21,910,673. *See* Ex. 28 (APPX. 0189-0190; 0287-0288), O'Bryan Report, at 8-9 & Attachment 13; *see also* Ex. 56 (APPX. 0982-1005), Factoring Agreement (12/19/18); Ex. 57 (APPX. 1006-1030), Factoring Agreement (2/27/19).

73.     From a review of the Plaintiffs' bank statements, the actual remittance amount paid under the remaining active MCA agreements was $21,882,652, which is less than the maximum allowable payment, and corrects 74 transactions listed in Plaintiffs' expert's excess payment calculation which were either: (1) not identified in Plaintiffs' bank statements; (2) were duplicate entries on the expert's schedule; or (3) did not represent a payment to Defendants, including one instance where Plaintiffs' expert calculated a $247,832 deposit to Plaintiffs as a payment to Defendants. *See* Ex. 28 (APPX. 0190-0191; 0211-0280; 0286-0290), O'Bryan Report, at 9-10 & Attachments 8, 12-14; Ex. 8, O'Bryan Dep., at 25:14-22; *see also* Exs. 63-65, 67 (APPX. 1126-1384; 1391-1459), Plaintiffs' Bank Statements; Ex. 3, Persing Dep. (3/12/20), at 42:4-20.

74.     Plaintiffs closed the bank account at TD Bank from which Defendants were withdrawing ACH debits in May 2019. *See* Ex. 3, Persing Dep. (3/12/20), at 150:10-14, 166:17-167:17; *see also* Ex. 67 (APPX. 1391-1459), TD Bank Statements (Dec. 2018-May 2019) (Persing 2nd Dep. Ex. 10), produced at TD0000859-TD0000926.

75.     Defendants advanced Plaintiffs all of the money under the parties' factoring agreements, and Plaintiffs received, kept, and used all of that money to operate HMC's business and generate income from it. *See* Ex. 1, DiPietro Dep. (7/6/20), at 253:6-10; Ex. 2, DiPietro Dep. (7/7/20), at 37:8-9, 43:5-8, 187:20-22; Ex. 3, Persing Dep. (3/12/19), at 276:16-277:1; Ex. 4,

Persing Dep. (7/9/20), at 150:15-19; *see also* Ex. 97 (APPX. 1697-1772), HMC QuickBooks Transaction Detail by Account (as of April 30, 2019) (Persing 1st Dep. Ex. 11).

76.    Daily ACH debits are authorized by the parties' factoring agreements, and Plaintiffs provided bank account access to Defendants. *See*, *e.g.*, Ex. 56 (APPX. 0985-0987; 0994; 0996-0997), Factoring Agreement (12/19/18), at p. 2, §§ 1.1, 1.2, 1.11, 1.13 (Protection 7), p. 11 (Authorization Agreement for Direct Deposit), p. 13 (Authorization to Resume ACH Debiting Form), p. 14 (agreeing to allow bank account access); *see also* Exs. 30-55; 57-58 (APPX. 0420-0981; 1006-1056), Factoring Agreements (same provisions); Ex. 2, DiPietro Dep. (7/7/20), at 181:10-16.

77.    UCC notices are authorized by the parties' factoring agreements. *See*, *e.g.*, Ex. 56 (APPX. 0986; 0990), Factoring Agreement (12/19/18), at § 1.13 (Protection 3) and p. 7 (Security Agreement); *see also* Exs. 30-55; 57-58 (APPX. 0420-0981; 1006-1056), Factoring Agreements (same provisions).

78.    The filing of a confession of judgment is authorized by the parties' factoring agreements. *See*, *e.g.*, Ex. 56 (APPX. 0986-0988; 0991; 0999-1002), Factoring Agreement (12/19/18), at §§ 1.13 (Protection 2), 3.2, 3.4, and p. 8 (Disclosure for Confession of Judgment), pp. 16-19 (Mandatory Joint Affidavit of Confession of Judgement); *see also* Exs. 30-55; 57-58 (APPX. 0420-0981; 1006-1056), Factoring Agreements (same provisions); Ex. 2, DiPietro Dep. (7/7/20), at 182:9-11; Ex. 6, Cole Dep., at 31:3-6, 106:4-14.

79.    On May 9, 2019, Plaintiffs were declared to be in default under certain of the parties' factoring agreements in which amounts of purchased receivables were not paid in appropriate amounts, and by not honoring contractual obligations and agreements. *See* Exs. 19-20, 60 (APPX. 0115-0117; 0131-0133; 1077-1110), First and Second COJs, Affidavits of Default and

Second COJ Accounting History (Ex. H); *see also* Ex. 6, Cole Dep., at 30:3-31:2, 35:19-36:11, 36:24-38:2, 40:17-41:18, 42:4-43:1, 45:5-14, 135:20-137:23, 180:16-19, 189:23-190:16, 191:3-8.

80.     Defendants filed their first confession of judgment against Plaintiffs on May 14, 2019, in which Defendants sought to collect on more than $11 million in purchased but unpaid receivables from the parties' factoring agreements. *See* Ex. 19 (APPX. 0111-0127), First COJ.

81.     After the first confession of judgment was stricken, Defendants filed their second confession of judgment, against HMC only, on October 3, 2019, in which Defendants again sought to collect on more than $11 million in purchased but unpaid receivables from the parties' factoring agreements. *See* Ex. 20 (APPX. 0128-0143), Second COJ.

**Plaintiffs Admit They Owe Defendants Millions of Dollars**

82.     On May 9, 2019, DiPietro stated that she "tripled checked each contract" and stated that HMC had "a total balance of $8,989,663.05" owed to Defendants. *See* Ex. 96 (APPX. 1692-1696), Email from K. DiPietro to J. Cole, *et al.* (5/9/19) (Persing 2nd Dep. Ex. 35), produced at CBSG(HMC)0009571.-CBSG(HMC)0009572; *see also* Ex. 4, Persing Dep. (7/9/20), at 149:4-11.

83.     On May 13, 2019, Plaintiffs admit in internal correspondence that CBSG has "provided HMC $26,011,550.96," that HMC has paid a total of $22,914,985.39," and that HMC has "an outstanding balance of $9,099,227.49." *See* Ex. 98 (APPX. 1773-1774), Email from K. DiPietro to J. Persing, *et al.* (5/13/19), produced at HMC010749 (DiPietro Dep. Ex. 61).

84.     In an affidavit filed on June 19, 2019 in the First COJ Action, DiPietro testified that CBSG provided HMC "a total of $11,811,779 and HMC has repaid a total of $8,134,783 within the past year, a difference of $3,676,996." *See* Ex. 23 (APPX. 0167), Affidavit of K. DiPietro (6/19/19) (DiPietro Dep. Ex. 93).

85.     In verified interrogatory responses submitted in this case, Plaintiffs admit they received from Defendants approximately $3.4 million more than they paid to Defendants. *See* Ex. 22 (APPX. 0159-0160), Pls.' Interrogatory Answers, No. 10 ("On May 14, 2019 defendants filed a confession of judgment with the Philadelphia Court of Common Pleas misrepresenting the balance owed by plaintiff to be $11,407,826.93 when it owed no more than approximately $3.4 million.").

86.     In deposition, HMC's CFO admitted that HMC's books and records from April 2019—specifically, HMC's QuickBooks statements—show that HMC received nearly $4 million more than it paid to Defendants. *See* Ex. 3, Persing Dep. (3/12/20), at 357:2-21, 362:7-365:1, 365:11-368:13, 371:13-372:1; Ex. 4, Persing Dep. (7/9/20), at 15:15-22; *see also* Ex. 97 (APPX. 1697-1772), HMC QuickBooks Transaction Detail by Account (as of April 30, 2019) (Persing 1st Dep. Ex. 11).

87.     Plaintiffs' expert relied upon statements by DiPietro, HMC's CEO, and Persing, HMC's CFO, that HMC made certain payments, and he assumed that the daily payments on the December 19, 2018 and February 27, 2019 factoring agreements remained the same, but he did not actually check all of the payments on the bank statements, he did not total the amounts paid to HMC or owed in total to Defendants, and he did not receive all bank statements—and, the alleged amounts of "excess payments" in his report are not being claimed as damages owed to Plaintiffs. *See* Ex. 10, July 10, 2020 Deposition of Charles Lunden ("Lunden Dep."), at 61:10-17, 62:22-63:6, 180:18-22, 204:11-19, 201:4-8, 201:12-17, 202:22-203:6, 203:15-23, 206:7-11, 206:15-17, 207:12-208:3, 224:24-225:7, 230:5-231:10, 236:9-16, 241:15-18, 246:12-17.

**Plaintiffs' Purported Damages Are Exclusively Contained in Their Expert's Report**

88.     DiPietro and Persing testified that Plaintiffs' alleged damages are exclusively contained and stated within their expert report, claiming that: "The expert report explains exactly what we are claiming as damages for lost clients"; "we are not' claiming damages for any lost customers beyond the expert report; "whatever we are seeking is in the most recent documents that you have been provided"; "the reason we hired the damages expert is so we could be as concise and exact as possible as it related to the quantifiable damages that we incurred"; "the claim for damages is centered about the damages report"; and, "The damages that we have provided are in the damages report." *See* Ex. 2, DiPietro Dep. (7/7/20), at 140:22-141:16, 146:22-147:2, 147:11-148:2, 149:16-150:7, 151:6-9, 153:16-20; *see also* Ex. 4, Persing Dep. (7/9/20), at 171:11-15; Ex. 21 (APPX. 0147), Ltr. from S. Heskin to Hon. Juan R. Sánchez (4/7/20), at p. 3 ("HMC could hardly proceed to trial without its expert report, as it would be essentially unable to prove *any* of its damages.") (emphasis in original).

89.     The alleged lost profit damages are exclusively contained within Exhibit A to the Lunden report, which identifies the seven purported lost customers, and claims damages in the amount of $2,666,910. *See* Ex. 2, DiPietro Dep. (7/7/20), at 158:4-159:1; *see also* Ex. 29 (APPX. 0309), April 2, 2020 Expert Report of Charles Lunden ("Lunden Report"), at Exhibit "A" (DiPietro Dep. Ex. 101); Ex. 10, Lunden Dep., at 82:14-16, 113:14-16, 192:18-193:16, 194:17-23, 196:13-23, 221:21-222:10, 222:16-19, 226:4-6, 244:11-17, 247:8-11.

**Plaintiffs' Purported "Lost Customers" Are Not Lost**

90.     *Armada Hoffler*: A representative from Armada Hoffler (or AHP Construction) testified in an affidavit that it hired HMC just one time, that the work on that project was completed in or around April 26, 2018, and that since May of 2019, Armada Hoffler has continued sending

HMC invitations to bid on Armada Hoffler projects. *See* Ex. 24 (APPX. 0171), Affidavit of J. Timothy Hodges, at ¶¶ 2, 4 (Lunden Dep. Ex. 13); *see also* Ex. 2, DiPietro Dep. (7/7/20), at 159:2-6; Ex. 28 (APPX. 0193), O'Bryan Report, at 12.

91.     ***DPR Construction***: A DPR representative testified in a deposition that it had subcontracted two projects to HMC, that DPR sent HMC 95 bids from 2013 to 2018, and that DPR is still soliciting proposals from HMC. *See* Ex. 11, June 4, 2020 Deposition of Christopher Hoffman ("Hoffman Dep."), at 21:17-22, 22:1-3, 28:15-18, 31:9-14 (Lunden Dep. Ex. 7).

92.     From July 2019 until April 21, 2020, DPR offered HMC 29 invitations to bid and DPR did not reduce the number of bids to HMC since May of 2019, DPR has not rejected any bids from HMC at all, and DPR would still "consider hiring" HMC. *See* Ex. 11, Hoffman Dep., at 22:4-7, 43:16-21, 43:22-44:15; *see also* Ex. 99 (APPX. 1775-1777), DPR Bid List (Hoffman Dep. Ex. 7); Ex. 28 (APPX. 0195), O'Bryan Report, at 14.

93.     A DPR representative testified that HMC "absolutely" did not lose its business with DPR as a result of the conduct of CBSG and that DPR is not a lost customer of HMC. *See* Ex. 11, Hoffman Dep., at 23:5-24:1, 52:13-16.

94.     ***Hensel Phelps***: A representative from Hensel Phelps testified in an affidavit that since May of 2019, Hensel Phelps has done business with HMC and, Hensel Phelps has been engaging with HMC on possible work on an upcoming project, as recently as April/May 2020. *See* Ex. 27 (APPX. 0178-0179), Affidavit of Clif Fesler, at ¶¶ 3, 6-7 (Lunden Dep. Ex. 12); *see also* Ex. 61 (APPX. 1111-1113), Hensel Phelps Job Audit Report; Ex. 66 (APPX. 1385-1390), Sandy Spring Bank Records Excerpts (showing payments from Hensel Phelps from August through November 2019); Ex. 28 (APPX. 0194), O'Bryan Report, at 13.

95.     Hensel Phelps' representative testified that Hensel Phelps did not receive any notices of assignment/lien from CBSG, and that Hensel Phelps has no documentation or records of any adverse action taken by Hensel Phelps against HMC in response to any notices of assignment/lien. *See* Ex. 27 (APPX. 0178-0179), Affidavit of Clif Fesler, at ¶¶ 3-5.

96.     ***Parkhurst Dining***: A Parkhurst representative testified in a deposition that the reason Parkhurst has not hired HMC has nothing to do with CBSG, and that he is not using HMC now because he has no projects. *See* Ex. 12, June 4, 2020 Deposition of Dave Freeland ("Freeland Dep."), at 30:8-14, 31:7-17, 36:5-10, 55:9-19; *see also* Ex. 28 (APPX. 0195), O'Bryan Report at 14.

97.     Parkhurst's representative testified that one individual who used to work with HMC stopped using HMC when DiPietro took over the company from her father. *See* Ex. 12, Freeland Dep., at 35:23-36:4; *see also* Ex. 77 (APPX. 1628-1630), Email from J. Hallman to A. Keeler (6/13/19), produced at PD0002272-PD0002273 (Freeland Dep. Ex. 3).

98.     ***Potomac Construction***: Potomac's CFO stated in response to written deposition questions that its last business with HMC was in August 2018, that Potomac stopped doing business with HMC because Potomac could not count on HMC as a reliable subcontractor, and that it never received a UCC notice. *See* Ex. 14 (APPX. 0003-0005), Potomac Written Deposition Answers, Nos. 3, 7, 9, 11-14 (Lunden Dep. Ex. 10); *see also* Ex. 28 (APPX. 0194), O'Bryan Report, at 13.

99.     ***Robins & Morton***: A representative from Robins & Morton testified in an affidavit that it hired HMC just one time and that after that one project, HMC has not bid on a single subsequent project of Robins & Morton. *See* Ex. 26 (APPX. 0176), Affidavit of Steve Wiley, at ¶¶ 3, 5 (Lunden Dep. Ex. 11); *see also* Ex. 28 (APPX. 0194), O'Bryan Report, at 13.

24

100.     HMC's CFO testified that HMC received payments from Robins & Morton after May/June 2019. *See* Ex. 3, Persing Dep. (3/12/20), at 169:17-170:17, 178:4-14; *see also* Ex. 68 (APPX. 1460-1551), Oct. 2019 and Dec. 2019 Bank Statements (Persing 1st Dep. Ex. 2), at APPX. 1530 (showing approximately $88,000 payment from Robins & Morton on October 2, 2019), and APPX. 1541 (showing approximately $83,000 payment from Robins & Morton on December 26, 2019).

101.     *Sodexo*: A representative of Sodexo testified in response to written deposition questions that Sodexo's last business with HMC was August 2018, and that the company has not done any business with HMC since 2018 for a variety of business reasons, and that HMC has not lost the opportunity to subcontract on future Sodexo projects by being placed in "delete status with an L payment block." *See* Ex. 13, June 30, 2020 Deposition of Stephen Dabrowski ("Dabrowski Dep."), at 4:23-5:3; 5:7-8, 5:22-6:1, 11:10-12:3 (Lunden Dep. Ex. 9); *see also* Ex. 28 (APPX. 0195), O'Bryan Report, at 14.

102.     Sodexo's representative testified that its receipt of the notices of assignment and lien from CBSG "is not the reason why Sodexo has not done any business with HMC since 2018," and  *See* Ex. 13, Dabrowski Dep., at 6:1-3.

103.     Sodexo's representative testified that Sodexo's receipt of the UCC-1 lien notice did not harm HMC's reputation with Sodexo and "had no impact on HMC's opportunity to bid to subcontract on future Sodexo projects." *See* Ex. 13, Dabrowski Dep., at 12:12-20.

104.     Plaintiffs' expert never spoke or otherwise communicated with any of the above purported "lost customers" in forming his opinion, and, despite being made aware of the foregoing testimony, he testified that he would not change his testimony or report in any way based upon the foregoing discovery from the alleged "lost customers." *See* Ex. 10, Lunden Dep. at 101:14-17,

114:3-6, 122:3-9, 122:17-21, 123:23-125:14, 143:10-20, 154:13-18, 163:8-12, 166:9-18, 170:24-171:5, 181:5-11, 185:17-22, 188:4-10; *see also id.* at 140:10-13, 150:6-9, 153:14-154:12, 162:7-15, 170:10-23, 173:12-15, 185:11-16, 188:1-3, 244:24-245:5 (conceding that he did not consider this evidence in reaching his conclusions).

105.     Plaintiffs' expert merely "assumed" these customers were lost for the reason DiPietro and HMC's CFO said (*i.e.*, the distribution and receipt of lien notices), he took DiPietro and HMC's CFO "at their word" that these customers were allegedly "lost" without "any further investigation," and he formed his opinion on "that information alone." *See* Ex. 10, Lunden Dep. at 101:18-102:8, 122:22-123:2, 123:6-9, 142:20-143:2, 191:24-192:13; *see also* Ex. 2, DiPietro Dep. (7/7/20), at 161:24-162:1 ("It is my belief that we have lost those customers.").

### Defendants' Evidence Shows Plaintiffs Owe Defendants Millions of Dollars

106.     Further, the accounting summary showing Defendants' transactions with HMC shows that Defendants advanced $25,432,102.20 to HMC, had been paid $21,886,152.49, and had purchased a total of $36,549,626.08 in future receivables. Ex. 25, Cole Dec., at ¶¶ 3-5; *see also* Ex. 100 (APPX. 1778-1916), Accounting Summary of Defendants' Transactions with HMC, produced at CBSG(HMC)0024482; Ex. 28 (APPX. 0185), O'Bryan Report, at 4.

107.     Plaintiffs owe Defendants $12,872,484 for unpaid accounts receivable (including prejudgment interest to which Defendants are entitled under the factoring agreements). *See* Ex. 28 (0186-0188; 0208; 0210; 0283), O'Bryan Report, at 5-7 & Attachments 5, 7 and 9; Ex. 8, O'Bryan Dep., at 29:21-30:6, 111:6-18; *see also* Ex 100 (APPX. 1778-1916), Accounting Summary of Defendants' Transactions with HMC, produced at CBSG(HMC)0024482; Exs. 49-50, 53, 55-58 (APPX. 0817-0861; 0910-0933; 0956-1056), Factoring Agreements; Exs. 63-68 (APPX. 1126-1551), Plaintiffs' Bank Records.

108. Plaintiffs have paid Defendants several millions of dollars less than HMC received from Defendants and, as a result, Plaintiffs owe Defendants a minimum of $3,317,079 simply by comparing the amounts funded by Defendants to what was remitted by HMC, and adding the statutory interest to which Defendants would be entitled under the parties' factoring agreements. *See* Ex. 28 (APPX. 0187-0188; 0211-0282; 0284), O'Bryan Report, at 6-7 & Attachments 8 (HMC Bank Statement Database) and 10; Ex. 8, O'Bryan Dep., at 9:23-11:22, 20:22-21:1, 24:25-25:22; *see also* Ex. 63-65, 67 (APPX. 1126-1384; 1391-1459), Plaintiffs' Bank Statements; Ex. 6, Cole Dep., at 434:9-12, 468:14-19; Exs. 49-50, 53, 55-58 (APPX. 0817-0861; 0910-0933; 0956-1056), Factoring Agreements.

109. More specifically, Defendants deposited into Plaintiffs' bank accounts $24,950,597 in funding but Plaintiffs only remitted $21,882,652 in accounts receivable to Defendants. *See* Ex. 28 (APPX. 0186-0187; 0211-0282), O'Bryan Report, at 5-6 & Attachment 8 (HMC Bank Statement Database); Ex. 8, O'Bryan Dep., at 9:23-11:22, 24:25-25:22.

Dated: July 23, 2020

Respectfully submitted:

**FOX ROTHSCHILD LLP**

By: /s/ Brett A. Berman
Brett A. Berman
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
Telephone: (215) 299-2842
Fax: (215) 299-2150
bberman@foxrothschild.com

Jonathan D. Christman
10 Sentry Parkway
Suite 200, P.O. Box 3001
Blue Bell, PA 19422
Telephone: (610) 397-6500
Fax: (610) 397-0450
jchristman@foxrothschild.com

*Attorneys for Defendants Complete Business Solutions Group, Inc. d/b/a Par Funding and Fast Advance Funding, Inc.*

## CERTIFICATE OF SERVICE

I, Brett A. Berman, hereby certify that, on this date, I caused the foregoing document to be filed electronically with this Court, where it is available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service of the filed document, upon the following:

Shane R. Heskin
William H. Fedullo
WHITE AND WILLIAMS LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
heskins@whiteandwilliams.com
fedullow@whiteandwilliams.com

*Attorneys for Plaintiffs HMC Incorporated and Kara DiPietro*

By: /s/ Brett A. Berman
Brett A. Berman

Dated: July 23, 2020