**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HMC INCORPORATED and KARA DIPIETRO, | |
| Plaintiffs, | |
| v. | Civil Action No. 19-cv-03285-JS |
| COMPLETE BUSINESS SOLUTIONS GROUP, INC. d/b/a PAR FUNDING and FAST ADVANCE FUNDING, INC., | |
| Defendants. | |

**DEFENDANTS COMPLETE BUSINESS SOLUTIONS GROUP, INC. AND FAST**
**ADVANCE FUNDING, INC.'S MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Brett A. Berman
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
Telephone: (215) 299-2842
Fax: (215) 299-2150
bberman@foxrothschild.com

Jonathan D. Christman
10 Sentry Parkway
Suite 200, P.O. Box 3001
Blue Bell, PA 19422
Telephone: (610) 397-6500
Fax: (610) 397-0450
jchristman@foxrothschild.com

*Attorneys for Defendants*
*Complete Business Solutions Group, Inc. d/b/a Par Funding and Fast Advance Funding, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ................................................................................ ii

I.     INTRODUCTION ...................................................................................... 1

II.    PROCEDURAL HISTORY ....................................................................... 2

III.   STATEMENT OF FACTS ......................................................................... 3

IV.    STANDARD OF REVIEW ........................................................................ 3

V.     ARGUMENT .............................................................................................. 5

       A.     Summary Judgment In Defendants' Favor Is Appropriate Because The
              Factoring Agreements Are Lawful And Enforceable Contracts That Are
              Neither Fraudulent, Nor Unconscionable, Nor Entered Under Duress ................ 5

              1.     Agreements Are Lawful And Enforceable Contracts ............................... 5

              2.     Agreements Are Neither Fraudulent Nor Breached By Defendants ......... 6

              3.     Agreements Are Not Unconscionable ..................................................... 11

              4.     Agreements Not Entered Into Under Duress, Or By Extortion .............. 13

              5.     Plaintiffs Defaulted Under The Active Factoring Agreements ............... 14

       B.     Summary Judgment Is Appropriate On Plaintiffs' Mail And Wire Fraud
              Claims Because There Is No Private Right Of Action Under The Statute ........... 15

       C.     Summary Judgment Is Appropriate On Plaintiffs' Civil RICO And RICO
              Conspiracy Claims Because There Is No Pattern Of Racketeering Activity ....... 15

       D.     Summary Judgment In Defendants' Favor Is Appropriate On Plaintiffs'
              Claims Because They Have Not Suffered Any Injuries Or Damages ................. 16

              1.     Plaintiffs' Claims All Require Proof Of Injury Or Damages .................. 16

              2.     Plaintiffs Concede That All Of Their Damages Are Contained In
                     Their Expert Report, And Those Damages Are Indisputably Non-
                     Existent ................................................................................................. 17

              3.     Even If Injured Or Damaged (They Are Not), Plaintiffs Still Owe
                     Defendants Millions Of Dollars ............................................................ 19

VI.    CONCLUSION ........................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anthony v. Duff & Phelps Corp.*,
No. 09-3918, 2010 WL 3222188 (E.D. Pa. Aug. 12, 2010) ....................................................4

*ARC DBPPROP001, LLC v. Easton Buffet LLC*,
No. 18-1995, 2019 WL 4645133 (E.D. Pa. Sept. 24, 2019) .............................................3, 4

*Atl. City Assocs., LLC, v. Carter & Burgess Consultants, Inc.*,
453 Fed. Appx. 174 (3d Cir. 2011) ....................................................................................18

*Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*,
40 A.3d 145 (Pa. Super. 2012) .....................................................................................6, 16

*Cardinal v. Kindred Healthcare, Inc.*,
155 A.3d 46 (Pa. Super. Ct. 2017) ....................................................................................11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...........................................................................................................4

*Chambers v. King Buick GMC, LLC*,
43 F. Supp. 3d 575 (D. Md. 2014) ....................................................................................15

*Degenhardt v. Dillon Co.*,
669 A.2d 946 (Pa. 1996) ...................................................................................................13

*EBF Partners, LLC v. Burklow Pharmacy, Inc.*,
No. 2017-292, 2018 WL 6620582 (Fla. Cir. Ct. Nov. 29, 2018) .........................................5

*Express Working Capital, LLC v. One World Cuisine Grp., LLC*,
No. 15-3792, 2018 WL 4214349 (N.D. Tex. Aug. 16, 2018) ..............................................5

*Express Working Capital, LLC, v. Starving Students, Inc.*,
28 F.Supp.3d 660 (N.D. Tex. 2014) ....................................................................................5

*Ferguson v. Moeller*,
No. 16-41, 2016 WL 1106609 (W.D. Pa. Mar. 22, 2016) ..................................................15

*In re GMI Grp., Inc.*,
No. 19-52577, 2019 WL 3774117 (Bankr. N.D. Ga. Aug. 9, 2019) .....................................5

*Gochin v. Thomas Jefferson Univ.*,
No. 16-6153, 2017 WL 2152177 (E.D. Pa. May 17, 2017), *aff'd*, 752 Fed.
Appx. 135 (3d Cir. 2019) .............................................................................................16, 17

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Gur v. Nadav*,
    178 A.3d 851 (Pa. Super. Ct. 2018) .....................................................................5

*Guy Chem. Co. v. Romaco, Inc.*,
    No. 06-96, 2010 WL 11566506 (W.D. Pa. July 28, 2010)....................................18

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ...........................................................................................15

*Hamburg v. Santander Bank, N.A.*,
    No. 16-5142, 2016 WL 7404482 (E.D. Pa. Dec. 21, 2016) ...................................4

*Jay Jala, LLC v. DDG Constr., Inc.*,
    No. 15-3948, 2016 WL 6442074 (E.D. Pa. Nov. 1, 2016)....................................18

*Kaiser by Taylor v. Monitrend Inv. Mgmt., Inc.*,
    672 A.2d 359 (Pa. Commw. Ct. 1996)..................................................................19

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    560 F.3d 156 (3d Cir. 2009) ..................................................................................4

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) ..........................................................................15, 16

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000) ................................................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .............................................................................................4

*Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247 (Pa. 2016)..........................................................17

*Nat'l Auto Brokers Corp. v. Aleeda Dev. Corp.*,
    364 A.2d 470 (Pa. Super. Ct. 1976) .....................................................................13

*NY Capital Asset Corp. v. F & B Fuel Oil Co.*,
    98 N.Y.S.3d 501 (N.Y. Sup. Ct. 2018)....................................................................5

*Pierre v. United States Postal Serv.*,
    No. 18-7474, 2019 WL 653154 (E.D.N.Y. Feb. 15, 2019) ..................................15

*Power Restoration Int'l, Inc. v. PepsiCo, Inc.*,
    No. 12-1922, 2015 WL 1208128 (E.D. Pa. Mar. 17, 2015) .................................18

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*,
   No. 16-1545, 2019 WL 1473090 (E.D.N.Y. Apr. 3, 2019) ...................................................... 5

*Radon Constr., LLC v. Land Endeavor 0-2, Inc.*,
   221 A.3d 654 (Pa. Super. Ct. 2019) ................................................................................. 13

*RRC Ne., LLC v. BAA Maryland, Inc.*,
   994 A.2d 430 (Md. 2010) ................................................................................................ 17

*Salley v. Option One Mortg. Corp.*,
   925 A.2d 115 (Pa. 2007) ................................................................................................ 11

*Saro v. Brown*,
   11 Fed. Appx. 387 (6th Cir. 2001) ................................................................................ 15

*Sarpolis v. Tereshko*,
   26 F. Supp. 3d 407 (E.D. Pa. 2014), *aff'd*, 625 Fed. Appx. 594 (3d Cir. 2016) .................... 16

*Sass v. Andrew*,
   832 A.2d 247 (Md. App. 2003) ..................................................................................... 16

*Smaller v. JRK Residential Mgmt. Corp.*,
   No. 16-2066, 2017 WL 616742 (E.D. Pa. Feb. 15, 2017) ..................................................... 11

*Smith v. Berg*,
   247 F.3d 532 (3d Cir. 2001) ......................................................................................... 15

*In re: Steele*,
   No. 17-03844-5, 2019 WL 3756368 (Bankr. E.D.N.C. Aug. 8, 2019) .................................. 5

*Walden v. Saint Gobain Corp.*,
   323 F. Supp. 2d 637 (E.D. Pa. 2004) .............................................................................. 4

*Walter v. Palisades Collection, LLC*,
   480 F. Supp. 2d 797 (E.D. Pa. 2007) ............................................................................ 16

*Wisdon v. First Midwest Bank*,
   167 F.3d 402 (8th Cir. 1999) ........................................................................................ 15

**Statutes**

41 Pa. Stat. Ann. § 201(b)(3) ............................................................................................ 5, 6

18 U.S.C. § 1341 ............................................................................................................ 15

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

18 U.S.C. § 1343 ............................................................................................... 15

18 U.S.C. § 1961(1) ........................................................................................... 15

18 U.S.C. § 1962(d) ........................................................................................... 15

Md. Code Ann., Com. Law § 12-103(e)(1) .......................................................... 6

Racketeer Influenced and Corrupt Organizations Act ............................... 2, 10, 15, 16

Uniform Commercial Code ........................................................................ 16, 17, 18

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................ 3

Defendants, Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG") and Fast Advance Funding, Inc. ("FAF") (together, "Defendants"), by and through their undersigned counsel, respectfully submit this brief in support of their Motion for Summary Judgment.

## I.   **INTRODUCTION**

This case can be resolved, and trial avoided, based upon this one, simple unrefuted and irrefutable fact: No matter what Plaintiffs claim, they still owe Defendants millions of dollars.

In response, Plaintiffs will certainly suffer the Court with verbose commentary, personal attacks, bluster and sophistry designed to bend reality, and tirades against the MCA industry generally and Defendants particularly. They will seek to rewrite history and run from their fatal admissions. But summary judgment is the put up or shut up moment in litigation, and Plaintiffs cannot establish a single dollar of damages or, said with even finer precision, a single additional dollar to be moved from Defendants' account to Plaintiffs' account at the conclusion of this case.

To be sure, the undisputed evidentiary record shows that the factoring agreements at the heart of this dispute are lawful and enforceable, as commercial deals knowingly and voluntarily entered into by commercially sophisticated businesspersons without deception, duress or coercion, and the actions taken in accordance with those agreements—including daily ACH debits, declaring default, confessing judgment, and seeking to collect on that judgment—were similarly permissible and authorized acts. Of course: Plaintiffs have no evidence of fraud. Plaintiffs have no evidence of racketeering. Plaintiffs have no evidence of conspiracy. Plaintiffs have no evidence of malicious or nefarious intent, or justifiable reliance. In short, the undisputed record shows that Plaintiffs have no shred of evidence to establish liability on any of their claims.

However, revealing the true fraud and sham in this litigation, Plaintiffs have no damages— and without damages—they have no viable claims. The undisputed evidentiary record, including Plaintiffs' own testimony and documents (including bank statements and contemporaneous

communications), buttressed by admissions of their expert and counsel, shows that Plaintiffs received significantly more money than they paid over the course of the parties' more than 50 agreements and, in fact, owe Defendants millions of dollars. Therefore, summary judgment is appropriate on Plaintiffs' claims and affirmative defenses to Defendants' counterclaims, and Defendants' counterclaims.

## II. <u>PROCEDURAL HISTORY</u>

The dispute between these parties originates from May 2019, when Plaintiffs defaulted on multiple factoring agreements executed by the parties and CBSG entered a confession of judgment against HMC and its principal, Plaintiff Kara DiPietro ("DiPietro"), in the amount of $11,985,719.32 in the Court of Common Pleas of Philadelphia County at Case No. 190501349 (hereinafter, "First COJ Action"). SOF ¶ 80. On June 19, 2019, Plaintiffs filed a petition to strike/open that confessed judgment and then removed the matter to this Court. *See Complete Business Solutions Group, Inc. v. HMC Incorporated, et al.*, No. 2:19-cv-02777-JS (E.D. Pa.).

Subsequently, and while the petition to strike/open in the First COJ Action was still pending, Plaintiffs filed the instant lawsuit against Defendants alleging, *inter alia*, breach of contract claims involving the same factoring agreements as the First COJ Action. Plaintiffs also stated claims under common law, United States mail and wire fraud and the federal RICO statute. *See* ECF Nos, 1, 10; *see also* SOF ¶ 1.[1] Defendants answered Plaintiffs' claims and asserted affirmative defenses and certain counterclaims against HMC and/or DiPietro, which Plaintiffs, in

---

[1]       On October 2, 2019, while this case was pending, the Court struck CBSG's confessed judgment in the First COJ Action. On the very next day, CBSG refiled a nearly-identical complaint in confession of judgment, against HMC only in the amount of $12,426,501.16 in the Court of Common Pleas of Philadelphia County at Case No. 190904761. *See Complete Business Solutions Group, Inc. v. HMC Incorporated, et al.*, No. 2:19-cv-04747-JS (E.D. Pa.) (hereinafter, "Second COJ Action"); *see also* SOF ¶ 81. Threshold Motions in that action—a petition to strike/open and motion to dismiss for lack of subject-matter jurisdiction—remain pending with the Court.

turn, answered together with stating affirmative defenses of unconscionability, duress, and extortion. *See* ECF Nos. 12, 15, 19; *see also* SOF ¶¶ 2-3.[2]

Discovery (other than agreed-upon depositions and the damages-related discovery the Court later permitted Defendants leave to take) in this matter closed on March 19, 2020.[3] *See* ECF No. 25; *see also* ECF Nos. 40, 42. On April 2, 2020, Plaintiffs served their expert report, wherein Plaintiffs claimed over $2 million in lost profit damages related to seven purported "lost customers." This report was the subject of a discovery dispute leading the Court to allow Defendants additional discovery from Plaintiffs and third parties related to Plaintiffs' damages theory. *See* ECF No. 42. Depositions of the parties and principals, as well as representatives of the purported "lost customers" and other witnesses were conducted. Defendants' expert report was provided on July 9, 2020, and both experts have been deposed. The case is now ripe for summary judgment, and Defendants timely move for summary judgment on Plaintiffs' claims and affirmative defenses to Defendants' counterclaims, and Defendants' counterclaims.

## III.    <u>STATEMENT OF FACTS</u>

Defendants incorporate by reference here their contemporaneously-filed Statement of Material Facts (hereinafter "SOF").

## IV.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'Material' facts are those 'that might affect the outcome of the suit under the governing law.'" *ARC*

---

[2]     The Court denied Defendants' motion to amend its counterclaims. *See* ECF No. 50.

[3]     Plaintiffs produced the vast majority of their documents late after the written discovery deadline had closed. In fact, more than 90% of the documents and pages produced by Plaintiffs in this case have been produced after document discovery ended.

*DBPPROP001, LLC v. Easton Buffet LLC*, No. 18-1995, 2019 WL 4645133, at *4 (E.D. Pa. Sept. 24, 2019) (Sánchez, J.) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)); *Hamburg v. Santander Bank, N.A.*, No. 16-5142, 2016 WL 7404482, at *1 (E.D. Pa. Dec. 21, 2016) (Sánchez, J.). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

It is initially the burden of the moving party to show the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "To defeat summary judgment, 'the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonable find for the [non-movant]." *Easton Buffet*, 2019 WL 4645133, at *4 (quoting *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and quotation marks omitted). The non-moving party cannot defeat summary judgment with conclusory, self-serving statements, but rather must "set forth specific facts" in the record. *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 161 (3d Cir. 2009). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." *Hamburg,* 2016 WL 7404482, at *1. The opposing party must also "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. Courts have emphasized that the "underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp.,* 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (Rufe, J.); *see also Anthony v. Duff & Phelps Corp.*, No. 09-3918, 2010 WL 3222188, at *1-2 (E.D. Pa. Aug. 12, 2010) (Diamond, J.).

## V.     ARGUMENT

A.     **Summary Judgment In Defendants' Favor Is Appropriate Because The Factoring Agreements Are Lawful And Enforceable Contracts That Are Neither Fraudulent, Nor Unconscionable, Nor Entered Under Duress.**

1.     **Agreements Are Lawful And Enforceable Contracts.**

The parties' factoring agreements are lawful and enforceable contracts under Pennsylvania law.[4] Courts across the country have upheld the validity of MCA contracts, and rebuffed claims that such contracts were unlawful, unconscionable, fraudulent, or usurious loans.[5] Those rulings apply with particular force here, where Pennsylvania's Usury Law expressly states that it does not apply to "business loans of any principal amount." *See* 41 Pa. Stat. Ann. § 201(b)(3); *see also Gur v. Nadav*, 178 A.3d 851, 857 (Pa. Super. Ct. 2018) (recognizing, business loans are exempted from Pennsylvania's Usury Law). Plaintiffs expressly agreed that the factoring agreements were entered into "FOR BUSINESS PURPOSES ONLY." SOF ¶ 29. Accordingly, even if the factoring

---

[4]     The agreements are governed by Pennsylvania law. SOF ¶ 30.

[5]     *See*, *e.g.*, *In re GMI Grp., Inc.*, No. 19-52577, 2019 WL 3774117, at *9 (Bankr. N.D. Ga. Aug. 9, 2019) (granting summary judgment on usury count where "the undisputed terms of the Agreement clearly demonstrate that it is not a loan"); *In re: Steele*, No. 17-03844-5, 2019 WL 3756368, at *4-5 (Bankr. E.D.N.C. Aug. 8, 2019) (concluding transaction was sale of future receivables, not a loan); *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, No. 16-1545, 2019 WL 1473090, at *5-6 (E.D.N.Y. Apr. 3, 2019) (granting summary judgment where transaction was sale of future receivables, not a loan); *EBF Partners, LLC v. Burklow Pharmacy, Inc.*, No. 2017-292, 2018 WL 6620582, at *2-3 (Fla. Cir. Ct. Nov. 29, 2018) (same); *Express Working Capital, LLC v. One World Cuisine Grp., LL*C, No. 15-3792, 2018 WL 4214349, at *8-9 (N.D. Tex. Aug. 16, 2018), *report and recommendation adopted*, 2018 WL 4210142 (N.D. Tex. Sept. 4, 2018) (granting motion for summary judgment where "the evidence supports Plaintiff's claim that the Agreements [for the sale of future receivables] are not loans, and therefore cannot support usury as an affirmative defense or counterclaim"); *NY Capital Asset Corp. v. F & B Fuel Oil Co.*, 98 N.Y.S.3d 501 (N.Y. Sup. Ct. 2018) (granting summary judgment and holding that transaction was for sale and purchase of accounts receivable and not a usurious loan); *Express Working Capital, LLC, v. Starving Students, Inc.*, 28 F.Supp.3d 660, 671 (N.D. Tex. 2014) ("Because the Agreements constituted valid account purchase transactions, Defendants' usury defense and counterclaim lack merit and Plaintiff is entitled to summary judgment on its breach of contract claim.").

agreements constituted loans (they did not), they would qualify as "business loans" that do not violate Pennsylvania's Usury Law. *See* 41 Pa. Stat. Ann. § 201(b)(3).[6]

### 2.   Agreements Are Neither Fraudulent Nor Breached By Defendants.[7]

Plaintiffs contend that the agreements are fraudulent—despite the undisputed fact that they executed more than 50 of these agreements over the course of 15 months. SOF ¶¶ 23, 26. HMC was connected to CBSG through a broker, at a time when HMC had other MCA agreements in effect. SOF ¶ 21. Before signing any MCA agreement, DiPietro "discussed things with lots of people," including other employees at HMC and accountants, and she had the opportunity to review with an attorney even if it was not actually reviewed by one. SOF ¶ 37. The factoring agreements were read and signed by DiPietro on behalf of HMC, in her capacity as owner and principal for HMC, and she testified that "I understand every deal that we have." SOF ¶ 27. Yet, Plaintiffs claim certain fees and increasing ACH debits constituted fraud.

Plaintiffs' first factoring agreement with CBSG on February 15, 2018. SOF ¶ 22. Over time, Plaintiffs signed more than 50 factoring agreements with CBSG, and two agreements with FAF. SOF ¶¶ 23, 26. DiPietro also personally guaranteed HMC's performance of and obligations under the factoring agreements. SOF ¶ 28. Under the parties' factoring agreements, the future receivables purchased by either CBSG or FAF, as the case may be, from HMC are paid to the purchaser (CBSG or FAF) in daily payments. SOF ¶ 33. Under the parties' agreements, HMC was

---

[6]     Maryland usury law is similar to Pennsylvania's, at least as it relates to corporate loans. *See* Md. Code Ann., Com. Law § 12-103(e)(1) (providing that, *inter alia*, "A lender may charge interest at any rate if the loan is . . . [a] loan made to a corporation").

[7]     In Pennsylvania, "to state a claim for common law fraud, the plaintiff must show: (1) a representation; (2) material to the transaction at issue; (3) made falsely, with either knowledge or reckless disregard of its falsity; (4) with the intent to misleading another person or inducing justifiable reliance; and (5) an injury caused by the reliance." *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 152 n.5 (Pa. Super. 2012).

advanced a total of $25,432,102.20, and agreed to pay a total of $36,549,626.08 in future receivables. SOF ¶¶ 31-32. Plaintiffs' fraud claims are rewrites of the contracts and history.

First, Plaintiffs had notice and awareness of the finance fees, and accepted them. As a general matter, finance fees are negotiated and Plaintiffs incurred two significant finance fees during the course of the agreements – a $472,356.60 finance fee incurred in November 2018, and a $412,296.24 finance fee incurred in December 2018. SOF ¶ 39. To avoid fees and increases, Plaintiffs would often take advantage of early payoff discounts on certain factoring agreements, but not always because DiPietro admits "I wasn't able to time it properly." SOF ¶ 40.

*The first finance fee*: On November 8, 2018, Plaintiffs were made aware of, provided notice of, and did not contemporaneously object in writing to the $472,356.60 finance fee on the August 28, 2018 factoring agreement. SOF ¶ 41.[8] Tellingly, HMC signed at least 20 more deals with CBSG after this first finance fee was assessed. SOF ¶ 43.

*The second finance fee*: On December 6, 2018, Plaintiffs were told that the deal was "due tomorrow, or else fee will be accrued," for which Plaintiffs acknowledged receipt and thanked CBSG "for reminder." SOF ¶ 44. On December 7, 2018, Plaintiffs were told that their balance on the October 3, 2018 factoring agreement "will go up after today, are you okay with that?" and DiPietro responded "It is what it is – but if you'd like to throw in $450k or so be my guest lol!" and further stated "It'll all 'come out in the wash'". SOF ¶ 45. Plaintiffs were provided the specific fee amount of $412,296.24 that "will be accrued after today," and Plaintiffs did not contemporaneously object in writing. SOF ¶ 46.

---

[8]     On that same date, Plaintiffs were given notice of a reassessed factor rate on the October 3, 2018 factoring agreement that would occur on December 7, 2018. SOF ¶ 42.

Second, Plaintiffs also had notice and awareness of the increasing ACH debits on the last two CBSG agreements (dated December 19, 2018 and February 27, 2019), and accepted them as well. As an initial matter, many of the parties' factoring agreements had payment clauses in which payments would increase at certain intervals. SOF ¶ 47. The last two factoring agreements with CBSG were signed on December 19, 2018 and February 27, 2019, and were funded in weekly installments, with the daily payment amounts beginning at a certain amount and increasing based on additional income. SOF ¶ 24. Under those two deals, CBSG advanced HMC approximately $3.89 million over several weeks under the December 19, 2018 agreement, and approximately $3.35 million over several weeks under the February 27, 2019 agreement. SOF ¶ 25.

*The December 19, 2018 agreement*: The parties' December 19, 2018 factoring agreement, with a Purchase Price of $3,890,000.00 and a Receipts Purchased Amount of $5,446,000.00, states that the Daily Specified Amount is "to be determined on percentage of income" and further states on its face that HMC "will be funded in weekly installments." SOF ¶ 48. Pursuant to the December 19, 2018 factoring agreement, Plaintiffs sold ten groups of accounts receivable at different dates to CBSG; for the initial funding, CBSG provided $630,500 on December 19, 2018, representing $882,700 of purchased receivables, and the initial payment made by HMC was $3,500, and the ratio of the initial payment amount of $3,500 to the initial purchased receivables of $882,700 is 0.40%. SOF ¶ 49. For each additional purchase of receivables under the December 19, 2018 factoring agreement, CBSG was entitled to additional payments, rather than the same initial daily payment of $3,500, resulting in an increase in daily amounts owed. SOF ¶ 50.

On January 23, 2019, Plaintiffs were informed that CBSG would be "increasing the daily draw on the most recent daily contract" and that "The payment will go from $3,500.00 to $12,337.00 (over 154 days) this will be applied for the wires sent so far." SOF ¶ 51. Later that

same day, DiPietro wrote Aida Lau an email with the subject line of "Increase OK" and specifically stated in the email that "your good to increase," which was then confirmed internally within the parties. SOF ¶ 52. Subsequently, the daily payment amount on the December 19, 2018 factoring agreement increased with each new distribution, at the same percentage from the initial daily payment. SOF ¶ 53. That same month, Plaintiffs expressed gratitude to CBSG for making HMC's business possible by providing "A Collection of Gratitude" book stating that CBSG has "played an integral role [*sic*] in HMC's success." SOF ¶ 38. Then, on February 14, 2019, in response to DiPietro's question regarding what CBSG had for HMC's daily payment amount, Plaintiffs were informed that CBSG would "be increasing payment by $2,188.00 for each funding" and that "Tomorrow the payment will be $14,525.00 coming out from your account." SOF ¶ 54. On February 25, 2019, Plaintiffs' internal correspondence shows that Plaintiffs acknowledged an open balance with CBSG over $10.5 million with a daily payment total of $63,036.68. SOF ¶ 63.

*The February 27, 2019 agreement*: Plaintiffs "knew the money was leaving" HMC's bank account at increasing amounts in February 2019, and Plaintiffs still signed another factoring agreement with CBSG in late February 2019. SOF ¶ 55. Indeed, DiPietro testified that "I am aware of every single penny that comes in and out of my business." SOF ¶ 56. The agreement worked similarly to the December 19, 2018 factoring agreement.

The parties' February 27, 2019 factoring agreement, with a Purchase Price of $3,350,000.00 and a Receipts Purchased Amount of $4,690,000.00, states that the Daily Specified Amount "begins at $4,583.00 per day, and increases based on percentage of income." SOF ¶ 57. Pursuant to the February 27, 2019 factoring agreement, Plaintiffs sold nine groups of accounts receivable at different dates to CBSG; for the initial funding, CBSG provided $544,500 on February 27, 2019, representing $762,300 of purchased receivables, and the initial payment made

by HMC was $4,583, and the ratio of the initial payment amount of $4,583 to the initial purchased receivables of $762,300 is 0.60%. SOF ¶ 58. For each additional purchase of receivables under the February 27, 2019 factoring agreement, CBSG was entitled to additional payments, rather than the same initial daily payment of $4,583, resulting in an increase in daily amounts owed. SOF ¶ 59. As with the December 19, 2018 agreement, the daily payment amount on the February 27, 2019 factoring agreement increased with each new distribution, at the same percentage from the initial daily payment. SOF ¶ 60.[9]

Thus, as is clear from above, Plaintiffs were made aware of the increases and did not contemporaneously object to these increases. SOF ¶ 61. Plaintiffs were routinely sent their account balances on the outstanding factoring agreements throughout 2020, without any objection in writing to the amounts owed. SOF ¶ 62. On May 1, 2019, in correspondence regarding an attempt to obtain a "new funding contract" DiPietro told Mack that HMC's "balances are big" and that she allowed them to "run full course" so that CBSG made more money. SOF ¶ 65. Indeed, Plaintiffs did not dispute in writing any increases until CBSG stopped giving MCA money[10] and, just weeks before May 2019, DiPietro wrote Mack informing him that "HMC is stronger than we have ever been. I know that it is 90% because of you and PAR Funding." SOF ¶ 67. Accordingly, the agreements—and actions taken pursuant to those agreements—are not fraudulent, and therefore summary judgment on Plaintiffs' breach of contract, fraud, and RICO claims is appropriate.

---

[9]     On April 16, 2019, Plaintiffs' internal correspondence shows that HMC's daily payment "is up to $77,255.87, with the two largest stemming from the two larger deals which they've steadily increased payment for as we drew from the remaining balance," and also stated that "The first $3M deal [December 19, 2018 factoring agreement] is at $19,179.43 per day and the second [February 27, 2019 factoring agreement] is now up to $19,995.00 per day and will increase again with this week's draw another $5K per day based on recent trends," and further stated that HMC's balance "[b]ased upon my rough analysis" was "sitting at approximately $6,362,269 due to CBSG." SOF ¶ 64.

[10]     CBSG did not agree to provide more funding in May 2019. SOF ¶ 66.

### 3.   **Agreements Are Not Unconscionable.**

In Pennsylvania, "a contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it." *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007). "An unconscionability analysis requires a two-fold determination: (1) that the contractual terms are unreasonably favorable to the drafter ('substantive unconscionability'), and (2) that there is no meaningful choice on the part of the other party regarding the acceptance of the provisions ('procedural unconscionability')." *Cardinal v. Kindred Healthcare, Inc.*, 155 A.3d 46, 53 (Pa. Super. Ct. 2017). Pennsylvania Courts "have refused to hold contracts unconscionable simply because of a disparity of bargaining power between the two parties." *Id.* The burden of proving unconscionability rests on the party alleging unconscionability. *Smaller v. JRK Residential Mgmt. Corp.*, No. 16-2066, 2017 WL 616742, at *2 (E.D. Pa. Feb. 15, 2017) (Schmehl, J.).

Fundamentally, Plaintiffs are commercially sophisticated and signed "a lot" of MCA contracts with similar provisions. HMC was founded by Gerry Dzurek in 1989 and then sold to his daughter, DiPietro[11], in 2015, and she has been the 100% owner since the sale. SOF ¶ 6. HMC, which has been in existence for over 30 years, is a full-service design/build and custom millwork firm, historically providing services across the country and specializing in food service and dining facilities, until more recently, when the business has "very much changed" and the company has "made lots of changes as it related to how the market was working." SOF ¶ 4. HMC has performed jobs for hotels, schools, hospitals, and military bases across the country, and been registered to do

---

[11]    DiPietro, a sophisticated business owner of three different companies (including HMC), was chosen as Maryland's small business person of the year in 2017 and is a member of U.S. Women's Chamber of Commerce. SOF ¶ 7. As CEO and owner of HMC, she is responsible for running all aspects of the business and overseeing operations, business development, budge, company financials, and company strategic decisions. SOF ¶ 8.

business in multiple states. SOF ¶ 5. Since 2015, HMC has had approximately 25-35 employees. SOF ¶ 12. HMC hires lawyers and accountants. SOF ¶ 13. Since 2013, HMC has had millions of dollars in revenue and DiPietro's email signature identifies HMC as one of the 5,000 fastest growing companies in the U.S. SOF ¶ 9. HMC has had more than $7 million in revenue since June 1, 2019. SOF ¶ 10. In that same time period HMC has generated more than $2 million in income. SOF ¶ 11.

Not only that, Plaintiffs have a history with the MCA industry and are "very familiar" with the type of financing arrangements and deals typical in the industry, including daily payments. SOF ¶ 15. Indeed, Plaintiffs, who were unable to secure bank financing, received merchant cash advance (MCA) money before CBSG, and signed "a lot" of MCA agreements. SOF ¶ 14. Plaintiffs have sought but not signed for any MCA money after Defendants' deals. SOF ¶ 16. HMC, LLC— a company owned by Dzurek with the same address as HMC, Inc. and which DiPietro has called HMC's "west coast affiliate" and clams to contribute 7% of "company revenue"—has actually received MCA money after the parties' factoring agreements, and transferred it to HMC, Inc. SOF ¶ 17. Moreover, DiPietro herself has also been directly involved in the MCA industry. She formed Kinetic Capital, LLC ("Kinetic Capital") in 2018, an ISO for CBSG, and began to connect or "steer" businesses looking for cash advances, including her father's consulting group (The Dzurek Group), with CBSG for funding. SOF ¶ 18. DiPietro used CBSG's agreement in forming Kinetic Capital's standard form contract. SOF ¶ 19. DiPietro consulted with an attorney in preparing Kinetic Capital's standard form contract. SOF ¶ 20. There is nothing about Plaintiffs, and nothing about the contracts, that make them substantively or procedurally unconscionable. Accordingly, summary judgment is appropriate on Plaintiffs' affirmative defense of unconscionability.

### 4.   **Agreements Not Entered Into Under Duress, Or By Extortion.**

Pennsylvania defines duress as "that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness." *Radon Constr., LLC v. Land Endeavor 0-2, Inc*., 221 A.3d 654, 659 (Pa. Super. Ct. 2019). Some courts distinguish between general duress and "economic duress/business compulsion." "The important elements in the applicability of the doctrine of economic duress or business compulsion are that (1) there exists such pressure of circumstances which compels the injured party to involuntarily or against his will execute an agreement which results in economic loss, and (2) the injured party does not have an immediate legal remedy." *Nat'l Auto Brokers Corp. v. Aleeda Dev. Corp*., 364 A.2d 470, 474 (Pa. Super. Ct. 1976). However, "economic duress" renders a contract voidable—not void—and "if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract", the contract is considered ratified and no duress defense is available. *Radon Constr.,* 221 A.3d at 661–62. Moreover, "In the absence of threats of physical harm, there can be no duress if the contracting party is free to consult with counsel." *Id*. at 659; *see Degenhardt v. Dillon Co.,* 669 A.2d 946, 952 (Pa. 1996) ("A party who has reasonable opportunity to consult with counsel before entering a contract cannot later invalidate it by claiming [economic] duress.").

In addition to the aforementioned commercial sophistication, along with knowledge and experience of the MCA industry, Plaintiffs voluntarily entered into all agreements, were not forced into signing them, and described HMC's relationship with CBSG in 2018 as "great." SOF ¶ 35. Plaintiffs negotiated the terms of their MCA agreements and knowingly "structured the draws and the daily payment" in the parties' factoring agreements. SOF ¶ 36. Plaintiffs further admit "[w]e did a lot of deals" with CBSG, and HMC has engaged attorneys for other contractual review and

13

legal work. SOF ¶¶ 13, 20, 23. Plaintiffs also accepted the benefits flowing from the agreements (*i.e.*, the cash advances), acquiesced in the agreements, and faced no physical threat or coercion in signing the agreements. SOF ¶¶ 23, 26, 66, 75. Lastly, there is no basis for extortion here as the record is devoid of any criminal conviction in the context of the parties' dealings. Accordingly, summary judgment is appropriate on Plaintiffs' affirmative defenses of duress and extortion.

### 5.   Plaintiffs Defaulted Under The Active Factoring Agreements.

As of May 6, 2019, Plaintiffs had nine remaining active MCA agreements (eight with CBSG and one with FAF) where Defendants had purchased a total of $17.2 million of future accounts receivable from the Plaintiffs. SOF ¶ 71. Defendants advanced Plaintiffs all of the money under the parties' factoring agreements, and Plaintiffs received, kept, and used all of that money to operate HMC's business and generate income from it. SOF ¶ 75. But, in May 2019, Plaintiffs stopped paying Defendants entirely, closed the bank account at TD Bank from which Defendants were withdrawing ACH debits, and they have not paid Defendants since their bank accounts were levied that month. SOF ¶¶ 70, 74. Under the agreements, it is a default not to pay receivables collected and to refuse to honor contractual obligations. SOF ¶ 69. On May 9, 2019, Plaintiffs were declared to be in default under certain of the parties' factoring agreements in which amounts of purchased receivables were not paid in appropriate amounts, and by not honoring contractual obligations and agreements. SOF ¶ 79.[12] As such, Plaintiffs breached the parties' agreements.

---

[12]   From a review of the Plaintiffs' bank statements, the actual remittance amount paid under the remaining active MCA agreements was $21,882,652, which is less than the maximum allowable payment, and corrects 74 transactions listed in Plaintiffs' expert's excess payment calculation which were either: (1) not identified in Plaintiffs' bank statements; (2) were duplicate entries on the expert's schedule; or (3) did not represent a payment to Defendants, including one instance where Plaintiffs' expert calculated a $247,832 deposit to Plaintiffs as a payment to Defendants. SOF ¶ 73. However, the maximum remittance allowed amount under the remaining active MCA agreements is $21,910,673, an amount greater than what Plaintiffs paid. SOF ¶ 72.

**B.      Summary Judgment Is Appropriate On Plaintiffs' Mail And Wire Fraud Claims Because There Is No Private Right Of Action Under The Statute.**

Summary judgment is appropriate on Plaintiffs' mail fraud and wire fraud claims because the statute does not provide a private right of action. *See, e.g., Wisdon v. First Midwest Bank*, 167 F.3d 402, 408 (8th Cir. 1999) ("[W]e agree with the Fifth and Sixth Circuits and hold that Congress did not intend to create a private right of action in enacting either the mail or wire fraud statues."); *Saro v. Brown*, 11 Fed. Appx. 387, 388 (6th Cir. 2001); *Pierre v. United States Postal Serv*., No. 18-7474, 2019 WL 653154, at *3 (E.D.N.Y. Feb. 15, 2019) (holding same and citing cases).

**C.      Summary Judgment Is Appropriate On Plaintiffs' Civil RICO And RICO Conspiracy Claims Because There Is No Pattern Of Racketeering Activity.**

A civil RICO action requires (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering, and an injury caused "by reason of" the RICO violation. *See Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 588 (D. Md. 2014).[13] These elements are generally consistent in the Third and Fourth Circuits. *See, e.g., Ferguson v. Moeller*, No. 16-41, 2016 WL 1106609, at *4 (W.D. Pa. Mar. 22, 2016). A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity, defined under 18 U.S.C. § 1961(1) as "any act which is indictable" under a number of specific criminal provisions, which include violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud). The predicate acts must be "related" and "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co*., 492 U.S. 229, 239 (1989).[14]

---

[13]      Regarding proximate cause, it requires "some direct relation between the injury asserted and the injurious conduct alleged." *Chambers*, 43 F. Supp. 3d at 603. "A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient." *Id*.

[14]      Otherwise, under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire" to violate § 1962(c). Thus, section 1962(d) liability attaches where a defendant conspires to operate or manage an enterprise prohibited under § 1962(c). *Smith v. Berg*, 247 F.3d 532, 536 (3d Cir. 2001). Because Plaintiffs' civil RICO claims fail for multiple reasons, Plaintiffs' RICO conspiracy claim similarly fails. *See, e.g., Lightning Lube, Inc. v. Witco Corp*., 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section

Plaintiffs complain about four categories of acts by Defendants: (1) the agreements (which were extensively discussed above); (2) the ACH debits from Plaintiffs' bank accounts (which were authorized by the aforementioned agreements); (3) the UCC lien notices (which were likewise authorized by the agreements); and (4) the confession of judgment and writs of execution (which were similarly authorized by the agreements upon Plaintiffs' default). None of these acts qualify as predicate acts of racketeering, such as mail or wire fraud, as each of them were lawful and, for the latter three, specifically authorized by the agreements executed. SOF ¶¶ 76-78. There can be no RICO violation based upon lawful agreements and the exercise of rights under those agreements. Therefore, summary judgment in Defendants' favor is appropriate on Plaintiffs' RICO and RICO conspiracy claims based upon the undisputed evidentiary record.

> **D.** **Summary Judgment In Defendants' Favor Is Appropriate On Plaintiffs' Claims Because They Have Not Suffered Any Injuries Or Damages.**

> **1.** **Plaintiffs' Claims All Require Proof Of Injury Or Damages.**

Plaintiffs' fraud, civil RICO, and breach of contract claims all require proof of compensable injury or damages to recover on these claims. As noted above, in Pennsylvania, one element of common law fraud is "an injury caused by" the justifiable reliance on a false and material misrepresentation. *Bennett*, 40 A.3d at 152 n.5.[15]

With respect to the RICO claims, the law is clear that a failure to show damages is fatal to the claim. *See, e.g., Maio v. Aetna, Inc.*, 221 F.3d 472, 483–84 (3d Cir. 2000); *Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797, 804-05 (E.D. Pa. 2007) (Robreno, J.); *see also Gochin v.*

---

1962 necessarily must fail if the substantive claims are themselves deficient."); *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 430 (E.D. Pa. 2014) (Tucker, J.), *aff'd*, 625 Fed. Appx. 594 (3d Cir. 2016) (same).

[15]     Maryland's fraud elements are similar. *See Sass v. Andrew*, 832 A.2d 247, 260 (Md. App. 2003) (emphasis added) (citing elements, including "*that the plaintiff suffered compensable injury resulting from the misrepresentation*").

*Thomas Jefferson Univ.*, No. 16-6153, 2017 WL 2152177, at *5 (E.D. Pa. May 17, 2017) (Sánchez, J.), *aff'd*, 752 Fed. Appx. 135 (3d Cir. 2019).

In Pennsylvania, the elements are (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) *resultant damages. Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).[16]

### 2.    Plaintiffs Concede That All Of Their Damages Are Contained In Their Expert Report, And Those Damages Are Indisputably Non-Existent.

Plaintiffs, Plaintiffs' CFO, Plaintiffs' expert, and Plaintiffs' Counsel all agree that Plaintiffs' purported damages are exclusively contained within Plaintiffs' expert's report and, specifically, Exhibit "A" to that report. SOF ¶¶ 88-89. More specifically, HMC's executives testified that Plaintiffs' alleged damages are exclusively contained and stated within their expert report, claiming that: "The expert report explains exactly what we are claiming as damages for lost clients"; "we are not' claiming damages for any lost customers beyond the expert report; "whatever we are seeking is in the most recent documents that you have been provided"; "the reason we hired the damages expert is so we could be as concise and exact as possible as it related to the quantifiable damages that we incurred"; "the claim for damages is centered about the damages report"; and, "The damages that we have provided are in the damages report." SOF ¶ 88.

However, the undisputed record demonstrates that Plaintiffs' purported seven "lost customers"—the only damages alleged by Plaintiffs—are not actually lost or, even more precisely, are not lost due to any actions of Defendant. SOF ¶¶ 90-103. These customers either stopped doing business with HMC before any UCC lien notices were distributed (Potomac Construction and Sodexo) or they are still sending HMC invitations to bid on projects and/or remain willing to work

---

[16]    The elements in Maryland are the same. *See RRC Ne., LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 442 (Md. 2010).

with HMC or receive bids after the UCC lien notices were distributed (Armada Hoffler, DPR Construction, Hensel Phelps, Parkhurst Dining, Robins & Morton). *Id.*[17] Some of these customers testified that they did not even receive the UCC lien notices; others testified that they worked with HMC after distribution of the UCC lien notices; uniformly, none testify to any harm, damage, or lost business with HMC. *Id.* Indeed, as several customers testified, HMC "absolutely" did not lose its business as a result of the conduct of CBSG and the receipt of any UCC lien notice "is not the reason" why business ceased. SOF ¶¶ 93, 102.

DiPietro's belief that these customers are "lost" due to CBSG is utter and mere speculation, and Plaintiffs' expert never once spoke or otherwise communicated with these lost customers before issuing his report. SOF ¶ 104.[18] Incredibly, Plaintiffs' expert merely "assumed" these customers were lost for the reason DiPietro and HMC's CFO said (*i.e.*, the distribution and receipt of lien notices), he took DiPietro and HMC's CFO "at their word" that these customers were allegedly "lost" without "any further investigation," and he formed his opinion on "that information alone." SOF ¶ 105. Thus, Plaintiffs have no facts to contest the undisputed record showing no actual lost profit damages.[19]

---

[17]    One customer testified to sending 29 invitations to bid since July 2019. SOF ¶ 92.

[18]    *See*, *e.g.*, *Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, No. 12-1922, 2015 WL 1208128, at *5 (E.D. Pa. Mar. 17, 2015) ("Damages for lost profits, like other contract damages, may not be awarded when the evidence leaves the trier of fact without any guideposts except his or her own speculation.") (citation omitted) (Pratter, J.); *Guy Chem. Co. v. Romaco, Inc.*, No. 06-96, 2010 WL 11566506, at *3 (W.D. Pa. July 28, 2010) ("[U]nder Pennsylvania law, more than speculation is required to prove causation of damages. Indeed, for lost profits, proximate causation must be proved.") (citation omitted).

[19]    Finally, in addition to having no facts to support their purported damages, under the parties' factoring agreements, HMC waived rights to recover consequential or punitive damages. SOF ¶ 34. Such clauses have been upheld. *See*, *e.g.*, *Jay Jala, LLC v. DDG Constr., Inc.*, No. 15-3948, 2016 WL 6442074, at *2 (E.D. Pa. Nov. 1, 2016) (Schmehl, J.); *Atl. City Assocs., LLC, v. Carter & Burgess Consultants, Inc.*, 453 Fed. Appx. 174, 180 (3d Cir. 2011).

### 3. Even If Injured Or Damaged (They Are Not), Plaintiffs Still Owe Defendants Millions Of Dollars.

Even if injured or damage (and they are not), Plaintiffs nonetheless still owe Defendants millions of dollars on the basis of a setoff, recoupment, or other equitable accounting, making summary judgment on Plaintiffs' claims appropriate. *See*, *e.g.*, *Kaiser by Taylor v. Monitrend Inv. Mgmt., Inc.*, 672 A.2d 359, 362–63 (Pa. Commw. Ct. 1996). Plaintiffs have repeatedly admitted that they owe Defendants millions of dollars; they cannot now escape the consequences and implications of these fatal admissions through revisionist history, reengineering, and regurgitated speculation: Contemporaneous with the events at issue, on May 9, 2019, DiPietro stated that she "tripled checked each contract" and stated that HMC had "**a total balance of $8,989,663.05**" owed to Defendants. SOF ¶ 82 (emphasis added). Days later, on May 13, 2019, Plaintiffs admitted in internal correspondence that CBSG has "provided HMC $26,011,550.96," that HMC has paid a total of $22,914,985.39," and that HMC has "**an outstanding balance of $9,099,227.49**." SOF ¶ 83 (emphasis added). In an affidavit filed on June 19, 2019 in the First COJ Action, DiPietro testified that CBSG provided HMC "a total of $11,811,779 and HMC has repaid a total of $8,134,783 within the past year, **a difference of $3,676,996**." SOF ¶ 84. In verified interrogatory responses submitted in this case, Plaintiffs admit they owed "**no more than approximately $3.4 million**." SOF ¶ 85 (emphasis added). In deposition, HMC's CFO admitted that HMC's books and records from April 2019—specifically, HMC's Quickbooks statements—show that HMC received *nearly $4 million more than it paid to Defendants*. SOF ¶ 86. When Plaintiffs began to dispute the amounts in writing, Plaintiffs stated that "The *only* problem has been the *rate of increase* in the two daily payments without warning, not the total amount due." SOF ¶ 68. Thus, Plaintiffs consistently admit that they received more than $3 million from Defendants than they paid to Defendants, and that the outstanding balance under the agreements was approximately $9 million.

Defendants' evidence is consistent with Plaintiffs' glaring admissions. Specifically, the accounting summary showing Defendants' transactions with HMC shows that Defendants advanced $25,432,102.20 to HMC, had been paid $21,886,152.49, and had purchased a total of $36,549,626.08 in future receivables. SOF ¶ 106. While Defendants contend that Plaintiffs owe Defendants $12,872,484 for unpaid accounts receivable (including prejudgment interest), there is no material dispute in the record that Plaintiffs have, in fact, paid Defendants several millions of dollars less than HMC received from Defendants and, as a result, Plaintiffs owe Defendants a minimum of $3,317,079 simply by comparing the amounts funded by Defendants to what was remitted by HMC, and adding the statutory interest to which Defendants would be entitled under the parties' factoring agreements. SOF ¶¶ 107-108. Defendants deposited into Plaintiffs' bank accounts $24,950,597 in funding but Plaintiffs only remitted $21,882,652 to Defendants. SOF ¶ 109.[20] This difference – of more than three million dollars – exceeds Plaintiffs' damages, which are exclusively contained in Exhibit "A" to Plaintiffs' expert report. SOF ¶ 88-89, 107-109.

## VI.    CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court grant Defendants' Motion for Summary Judgment, and enter judgment in Defendants' favor and against Plaintiffs.

Dated: July 23, 2020                             Respectfully submitted:
                                                 **FOX ROTHSCHILD LLP**
                                                 By: /s/ Brett A. Berman
                                                 Brett A. Berman
                                                 *One of the Attorneys for Defendants*

---

[20]    Plaintiffs' expert relied upon statements by DiPietro, HMC's CEO, and Josh Persing, HMC's CFO, that HMC made certain payments, and he assumed that the daily payments on the December 19, 2018 and February 27, 2019 factoring agreements remained the same, but he did not actually check all of the payments on the bank statements, he did not total the amounts paid to HMC or owed in total to Defendants, and he did not receive all bank statements—and, the alleged amounts of "excess payments" in his report are not being claimed as damages owed to Plaintiffs. SOF ¶ 87.

<u>**CERTIFICATE OF SERVICE**</u>

I, Brett A. Berman, hereby certify that, on this date, I caused the foregoing document to

be filed electronically with this Court, where it is available for viewing and downloading from

the Court's ECF system, and that such electronic filing automatically generates a Notice of

Electronic Filing constituting service of the filed document, upon the following:

Shane R. Heskin
William H. Fedullo
WHITE AND WILLIAMS LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
heskins@whiteandwilliams.com
fedullow@whiteandwilliams.com

*Attorneys for Plaintiffs HMC Incorporated and Kara DiPietro*

By: /s/ Brett A. Berman
Brett A. Berman

Dated: July 23, 2020